353 F.2d 13
 66-1 USTC P 9104
 Jack F. KITCHIN and Wilma H. Kitchin, Kitchin Equipment
Comapny of Virginia, Inc., and Motor Crane Service
Company, Inc., Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
 No. 9497.
 United States Court of Appeals Fourth Circuit.
 Argued Oct. 7, 1964.
 Decided Jan. 11, 1965, Argued on Rehearing Oct. 7, 1965,
Order on Rehearing Nov. 23, 1965.
 
 Fortescue W. Hopkins, Roanoke, Va. (Hopkins, Pearson & Engleby, Roanoke, Va., on brief) for petitioners.
 Deward L. Rogers, Atty., Dept. of Justice (John B. Jones, Jr., Acting Asst. Atty. Gen., and Lee A. Jackson and David O. Walter, Attys., Dept. of Justice, on brief), for respondent.
 Before HAYNSWORTH, Chief Judge, and SOBELOFF, BOREMAN, BRYAN and J. SPENCER BELL, Circuit Judges, sitting en banc.
 J. SPENCER BELL, Circuit Judge.
 
 
 1
 The principal question in this appeal is whether payments made under a leaseoption contract should be prospectively characterized as either rental payments or sales proceeds and taxed accordingly in the years in which they are made or held in abeyance until the option is acted upon. In our former opinion, Kitchin v. C.I.R., 340 F.2d 895 (4 Cir. 1965), we held that the incidence of the tax could be postponed until the classification was fixed by the decision of the lessee/buyer in exercising or declining to exercise the option. We have granted the petitions for rehearing in order that we might reconsider the underlying economic and administrative consequences of that decision in this broad area of business activity on both taxpayers and the government, as it is contended that these were not fully presented to or appreciated by the court at the original hearing.[1] The factual details of this case are set out in the former opinion and need not be repeated except to point out that the contracts covered the use of machinery for a relatively short term construction project which was to be completed in a period of 24 months. Thus the maximum term during which the machinery was to be used could be no more than two years and in most cases considerably less.[2] At most then the delay in recognizing income in this case would be to the third tax year. Furthermore, the contracts involved in this case were exceptions to the petitioner's regular practice of straight leases without option to buy. The government, however, insists that this factual situation is far from typical; that there is a tremendous volume of business done under lease-option contracts and that many of these contracts run for a much longer period of time with consequent delays in tax treatment which would be detrimental and disruptive to both the taxpayer and the government if the decision were to prevail. While a short delay may not be upsetting either to the taxpayer or to the government's administration of the tax laws in exceptional cases, in general our tax laws are based upon the principle that only a system of annual accounting will produce a regular flow of income to the treasury and permit the application of methods of accounting, assessment and collection capable of practical application by both the government and the taxpayer. Mertens 12.07.
 
 
 2
 Our former decision was based upon the rationale of Virginia Iron Coal & Coke Co. v. C.I.R., 99 F.2d 919 (4 Cir. 1938), cert. denied, 307 U.S. 630, 59 S.Ct. 833, 83 L.Ed. 1513. That case involved the so-called 'straight' option. The taxpayer had entered into an option to sell mining lands at an agreed price. The option was to remain open for a period of years upon payment of an annual amount which was to be credited on the purchase price or forfeited if the option was not exercised. The seller reported the payments as 'option income' in the year that the holder notified the taxpayer in writing that the option would not be exercised. While it is true as a matter of logic that the same difficulty arises in prospectively categorizing the payments in the case before us as existed in the Virginia Coal case, nevertheless, we are convinced that there are differences in the underlying economic consequences to the parties in such a 'straight' option and in the average lease-option contract involving the concurrent use of the property by the lessee/buyer which justify a distinction for purposes of taxation. In a sense, the straight option exists in an economic vacuum. Its creation does not normally cause any appreciable change in the ownership or possession of the property. At its inception there are no tax consequences for the purchaser of the option. If the option is exercised, the consideration paid for the option is likely to represent only a minor fraction of the consideration received for the entire transaction, but in any event there is no taxnecessity of differentiating between the amount paid for the privilege of the option and that paid as consideration for the thing optioned. Further the issuance of straight options are likely to be isolated transactions.[3] Because straight options are thus insulated from other tax occurrences, they present substantially different problems with regard to tax administration than do the periodic payments involved in the normal leaseoption agreement which is so common in modern business.
 
 
 3
 Since the lease-option contemplates possession by the lessee (optionee) the perodic payments are likely to represent a much larger portion of the total transaction. In many cases these payments will represent the total consideration. Thus if the lease runs until the option price is paid in 'rent', half the total consideration will have been paid at points in time closer to the inception than the termination of the transaction. Failure to exercise the option in long term lease-contracts would result in bunching of income in the year the option expires and may result in a heavy tax burden on the lessor.
 
 
 4
 Failure to characterize the transaction in the beginning would not only interfere with the recognition of income but also with the allowance of a deduction for depreciation. Only the 'owner' may take the depreciation deduction. If ownership is left in doubt until exercise or forfeiture of the option, then depreciation must also be held in suspense. This would involve a change in the practice of allowing the depreciation deduction only in the year in which the wear and tear occurred. Mertens 23.18. The principle behind this yearly deduction for depreciation is that the deduction roughly corresponds to the income produced in the process of that wear and tear. Massey Motors, Inc. v. United States, 364 U.S. 92, 104, 80 S.Ct. 1411, 4 L.Ed.2d 1592 (1959). If characterization is delayed and the option is forfeited no violence is done to this principle. Depreciation could be applied against the rental income.[4] If the option is exercised, however, there is a totally different situation. The lessee has no deferred income; depreciation would be charged against current income which is unrelated to the wear and tear.
 
 
 5
 Finally, we think it clear in this case that the periodic payments represented a fair return for the use of the equipment and that the contracts were exactly what they purported to be; i.e., leases with options to purchase and not disguised sales. Consequently the Tax Court correctly held that the payments were ordinary income in the years received. Rotorite Corp. v. Commissioner, 117 F.2d 245 (7 Cir. 1941).
 
 
 6
 Accordingly we conclude that the Tax Court correctly categorized the payments here involved as rental income and properly put the income and deduction items on an annual basis in conformity to our system of taxation. The former opinion is withdrawn and the opinion of the Tax Court is affirmed.
 
 
 7
 Affirmed.
 
 
 
 [1]
 See Llewellyn, The Common Law Tradition, Situation-Sense and Reason, 121 et seq. (1960)
 
 
 [2]
 In five out of a total of 32 contracts, the option was exercised or terminated in time to be reported within the first tax year
 
 
 [3]
 Except put and call stock options which are treated separately. See Rev. Rule 58-234
 
 
 [4]
 But see Kelly, 26 P-H Tax Ct. Mem. 36 (1957)