Norman Baker Smith and Barbara Anne Smith, Petitioners *v.* Commissioner of Internal Revenue, Respondent

Docket No. 4412–66. Filed December 18, 1968.

*Ralph E. Kingston*, for the petitioners.
*Martin A. Schainbaum* and *Harry Morton Asch*, for the respondent.

Scott, *Judge:* Respondent determined deficiencies in petitioners' income taxes for the calendar years 1962 and 1963 in the amounts of $4,126.99 and $707.88, respectively.

The issues for decision are:

(1) Whether 40 percent of the monthly payments made by petitioners for the period January through May 1962 designated as rental of a property which they purchased as of May 31, 1962, pursuant to an option permitting 40 percent of the stated rental of the property to be applied to the purchase price upon exercise of the option to purchase, is deductible by petitioners during the year 1962 as rent or should be considered as part of the purchase price of the property.

(2) Whether 25 percent of the amounts paid by petitioners during each of the years 1962 and 1963 as the stated rental of another property which they were renting under a lease which gave them an option to purchase and credit 25 percent of the rentals paid to the purchase price, is properly deductible by petitioners as rent during the years when it was paid or should be considered as an amount paid to obtain an option to purchase.

(3) Whether an amount paid by petitioners for the last year's rent of the property which they were leasing for a period of 5 years beginning in February 1962 with an option to purchase is properly deductible in the year 1962 when the payment was made.[1]

(4) What is the proper amount of depreciation deductible by petitioners in each of the years 1962 and 1963 with respect to the property acquired by them on May 31, 1962? The determination of this issue requires an allocation of the total cost of the property between the land and the depreciable improvements thereon and a determination of the useful life of the improvements on the land at the date the property was acquired by petitioners.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Norman Baker Smith and Barbara Anne Smith, husband and wife who at the time of the filing of the petition in this case were residents of El Dorado County, Calif., filed joint Federal income tax returns for the calendar years 1962 and 1963 with the district director of internal revenue at San Francisco, Calif. During the years here in issue petitioners kept their books and reported their income on the cash basis of accounting except that the books of a dress shop business operated by Barbara Anne Smith (hereinafter referred to as Barbara) were kept and the income from that business reported on an accrual basis.

Norman Baker Smith (hereinafter referred to as petitioner when used in the singular) is a physician and surgeon. Prior to 1959 he had been engaged in the practice of medicine in Nevada. He moved to Stateline, Calif. (now known as South Lake Tahoe, Calif.) in 1959 and took over the practice and lease of office space of an elderly physician in Stateline who was preparing to retire.

The office space to which petitioner acquired the lease was in a building located on property known and hereinafter referred to as the Rainboldt property. Shortly after petitioner acquired the lease to the office space of the physician whose practice he was taking over, he negotiated a 25-year lease on the Rainboldt property. The Rainboldt property consisted of a lot 50 × 297 feet. The front portion of the lot which was 50 feet wide was on U.S. Highway No. 50, approximately 1,100 feet from the California-Nevada State line. U.S. Highway No. 50 runs in a northeasterly-southwesterly direction through the States of Nevada and California. In the area of Stateline where the Rainboldt property was located, U.S. Highway No. 50 is approximately 7 or 8 blocks southeast of the shoreline of Lake Tahoe. The Rainboldt property lies be-

---

[1] It is not clear whether this issue is still in controversy between the parties but because of this lack of clarity it will be covered in our Opinion.

tween two other properties consisting of lots 50 × 297 feet with 50 feet bordering U.S. Highway No. 50, known and hereinafter referred to as the Neff property and the Perrin property. The Neff property is on the southwest side of the Rainboldt property and the Perrin property on the northeast side which makes it approximately 50 feet closer to the Nevada-California State line than the Rainboldt property. The property directly across Highway No. 50 from the Rainboldt, Neff, and Perrin properties is zoned residential-tourist or residential, and this zoning extends to the shores of Lake Tahoe. The Neff, Perrin, and Rainboldt properties during the years here in issue were zoned commercial as were other properties lying immediately along U.S. Highway No. 50 except for a small area directly across from the Rainboldt, Neff, and Perrin properties. The Neff property was improved with a small resident unit, a real estate shack, and a substandard dwelling on the rear portion. The Perrin property was improved with a building containing a store called "Perrin's Dress Shop," three apartments, and an attic room with no separate plumbing facilities.

On May 17, 1958, Lawrence M. Weaver and Lena A. Weaver had leased the Perrin property from Cecil Perrin and Marion E. Perrin, the fee owners, at a rental of $860 per month with an option to purchase the property for $86,000. The lease provided for the payment in advance of the last year's rental of $10,320. It also provided that in the event the option to purchase were exercised, any amount of unused advanced rental which had been paid to the lessor by the lessee should be credited on the purchase price of the property, and it further provided that 40 percent of all rental payments made from the beginning date of the lease to and including the date of the option exercise would be credited on the purchase price of the property. The lease also provided that the property should be maintained and all necessary repairs and replacements made by the lessee and that the lessee should pay all utility charges on the property but that the lessor should pay all real estate taxes on the property as they became due.

Petitioners and the Weavers on September 9, 1959, executed a document entitled, "Agreement for Sale of Business and Sub-Lease of Property." This agreement provided for the sale by the Weavers of their business known as Perrin's Dress Shop to petitioners and the assignment by the Weavers to petitioners of their lease of the Perrin property including the option to purchase such property. The agreement provided that the business of Perrin's Dress Shop would be transferred to petitioners as of December 1, 1959, and the assignment to petitioners of the lease on the Perrin property would be made as of that date. The consideration for the sale was stated to be the sum of $115,000 plus the wholesale value of any merchandise on hand in Perrin's Dress Shop as of December 1, 1959. The agreement specified the

manner in which the $115,000 was to be paid, a portion of the payment to be discharged by crediting thereto the amount of $69,488 which it was determined the buyers would have to pay or assume in connection with the exercise of the option to purchase the Perrin property. The agreement contained the following provision with respect to the exercise of the option to purchase by petitioners:

10. Option to Purchase: It is contemplated by this agreement that the Buyers will exercise the option to purchase the real property and improvements hereinbefore in this agreement described. Reference to the representations hereinbefore in this agreement set forth is expressly made as though here set forth in haec verba. It is a specific requirement hereof, and was contemplated in computing the amount of the consideration herefore set forth in paragraphs 1 and 4 of these terms and conditions, that such option must be exercised so that such exercise will be effective prior to June 1, 1962, and the Buyers specifically agree that they will exercise such option so as to make the same effective prior to said date of June 1, 1962. If, and when, said option is so exercised by the Buyers, the Sellers hereby assign and transfer to the Buyers the prepaid rent deposit of $10,320.00 now in the hands of Cecil Perrin and Marion E. Perrin, his wife, the present record owners of the above described property, as the same must be applied on the required down payment of the purchase price for said property. * * *

The transfer of the business and lease by the Weavers to petitioners was actually made in January 1960 and Barbara then began operation of the dress shop.

By instrument executed on February 7, 1962, between Francis M. Neff and Ann C. Neff, as lessors and owners, and petitioners as lessees, petitioners leased the Neff property for a period of 5 years commencing February 1, 1962, for a monthly rental of $350. The lease provided that petitioners should pay to the lessors the last year's rental in the sum of $4,200 in advance. The lease also provided that the tenants should pay all taxes and assessments and other charges levied against the premises by any governmental agency or taxing authority and that the tenants should pay all utilities, repairs, and upkeep on the property. The lease further provided:

22. *Option to Purchase.* At any time within the five (5) year term of this lease or any written extension thereof, Tenant shall have the option to purchase said premises, including all of the improvements thereon at the purchase price of $75,000.00 payable as follows: 29% of said purchase price or the sum of $21,750.00 shall be paid as a down payment. Of said sum of $21,750.00, 25% of the earned rent paid by the Tenant during the term of the lease before the exercise of said option shall apply and be credited to said sum of $21,750.00 * * * As used herein, the term "earned rental" shall mean only the $350.00 per month cash rental paid by Tenant to Owner and shall not include tax and assessments paid by Tenant. * * *

On May 31, 1962, petitioners exercised the option to purchase the Perrin property. The cost to petitioners of the entire Perrin property including land and improvements was $99,178. The Perrin property

consists of an inside lot of a rectangular shape which is fairly level. The original building on the property was constructed in 1947 and contained 1,554 square feet. In 1957 the building had been remodeled and increased in size to about 3,500 square feet. The building is a concrete brick building sitting on a concrete slab foundation. It consists of two stories and an attic under a gable roof. On the first floor or ground floor of the building is the store with a glass-front display area facing on U.S. Highway No. 50 and a bachelor apartment in the rear. On the second floor a two-bedroom apartment is in the front portion of the building and a one-bedroom apartment in the rear. Access to the second story is from an exterior staircase which is enclosed by a wooden enclosure in such a manner as to in reality be a separate part of the building. A sleeping room has been constructed in the attic. Access to this sleeping room is by an inside stairway leading from the bedroom in the rear apartment. The interior partitions in the building are of wood-frame construction. In the living quarters both the ceilings and walls have a dry textured tape finish. The interior finish in the store portion of the building is plywood and the ceiling in the store has been dropped to a height of 7 feet 4 inches to accommodate recessed lighting fixtures which have been placed in the store ceiling. The showroom in the store is part of the installation made when the building was remodeled in 1957. The glass-enclosed showroom on the front is approximately 8 feet high, 20 feet wide, and 8 feet deep. The front portion of the lot is improved with a combination of concrete and blacktop paving and in the rear of the building there is a concrete patio. There are six entrances from U.S. Highway No. 50 onto the property.

The many casinos which are a prime tourist attraction in the general area in which the Perrin property is located are just across the Nevada State line. Since tourists very often obtain accommodations in California, the closer properties are to the State line, the better suited they are for use for tourist accommodations. The best use of the land of the Perrin property is for a motel or similar tourist accommodation. The lot would have been adequate under the regulations with respect to building applicable to it in 1962 to accommodate a 14-unit motel. Because of being zoned commercial there would not be certain limitations on usage of the property that would apply to property zoned residential-tourist.

Based on the type of construction and general characteristics of the improvements on the Perrin property, the useful life of such improvements would normally be approximately 50 years from the date of construction. However, because of the changing nature of use of property in the area in which the Perrin property was located which accelerated after the holding of the 1959–60 Olympic games in Squaw

Valley, and the fact that the building on the property was not the type needed for the property to be utilized to its best advantage, the economic useful life of the improvements on the Perrin property as of 1962 was approximately 10 years.

Several pieces of property in the general area of the Perrin property had been sold during the period 1960 through 1963, but none of these properties was strictly comparable to the Perrin property. Some of the properties which were sold had improvements and in some instances the improvements were removed shortly after the sale. The property most nearly comparable to the Perrin property which was sold during this period of time was a rectangular shaped inside lot located on the same side of Highway No. 50 as the Perrin property approximately 1 block further from the Nevada State line than the Perrin property. This lot fronted 85 feet on Highway No. 50 and had a depth of 297 feet and was unimproved. It was a reasonably level lot. This parcel was listed during 1962 for sale for $90,000 and was sold in September 1963 for $85,000.

In the year 1962 a fire and extended-coverage insurance policy, issued by the National Union Fire Insurance Co., was placed on the improvements on the Perrin property, and the valuation of the improvements for insurance purposes was listed as $52,000. The $52,000 valuation was approved by the insurance company after a representative of the company had examined the property and estimated the replacement cost of the improvements but the $52,000 valuation was not a guaranteed payment by the insurance company in case of total destruction of the improvements. The replacement cost new in the year 1962 of the improvements on the Perrin property would run somewhere between $12 and $15 a square foot or a total cost of from $42,000 to $52,500.

After adjusting for vacancies of 5 percent, a reasonable estimate of the total gross rental income which might be obtained from the Perrin property in 1962, had the entire property been rented, is approximately $10,600 per annum.

The area in which the Perrin property was located was in a period of rapid transition in 1962 from lower to higher uses of the land. There were a number of buildings in the general area of the property which, although physically capable of many years of future use, were removed because they could not economically compete with the newer and better construction in the area offering similar types of facilities.

Using a 10-year remaining useful life for the improvements on the Perrin property and allocating a value to the land of $55,000 in 1962, a capitalization of income approach to the evaluation of the improvements on the property would indicate a value of the improvements of $23,480.

When petitioners acquired the Perrin property they had planned to be able to acquire the Rainboldt and Neff properties, either by outright purchase or by long-term leases, so as to have the three adjoining properties near the California-Nevada State line to be used as one property. A 150-foot lot would be of sufficient size to build a motel or other tourist accommodation which could be operated at a higher profit return than a motel or tourist accommodation of the size that could be placed on a 50-foot lot. When petitioners were unable to acquire the Rainboldt property, they did not exercise their option to purchase the Neff property.

The El Dorado County assessment records are based on fiscal years beginning the first Monday of July. Valuation is made several months prior to July 1 of each year, but the new assessment valuation is not entered on the books until approximately July 1. The year entered on the assessment records for the valuation of the land and improvements is the year in which the beginning of the valuation period falls. The assessment value in El Dorado County is at 25 percent of the appraised fair market value of the property. County appraisers inspect the property and make appraisals on which the assessed value is based. The records of El Dorado County show the following as the assessed value of the land and improvements constituting the Perrin property for the years indicated:

| Year | Land | Improvements | Year | Land | Improvements |
|------|------|--------------|------|------|--------------|
| 1949 | $1, 250 | $4, 000 | 1958 | $6, 500 | $6, 600 |
| 1950 | (¹) | (¹) | 1959 | 6, 500 | 6, 600 |
| 1951 | 1, 250 | 4, 000 | 1960 | 14, 000 | 6, 600 |
| 1952 | 1, 250 | 4, 000 | 1961 | 14, 000 | 6, 600 |
| 1953 | 1, 250 | 4, 000 | 1962 | 10, 000 | 4, 500 |
| 1954 | 1, 250 | 4, 000 | 1963 | 10, 000 | 4, 500 |
| 1955 | 1, 250 | 4, 000 | 1964 | 11, 250 | 4, 500 |
| 1956 | 1, 750 | 4, 000 | 1965 | 11, 250 | 4, 500 |
| 1957 | 1, 750 | 6, 600 | 1966 | 11, 250 | 4, 500 |

¹ Not available.

On their Federal income tax return for the year 1962 petitioners deducted $4,300 as rent on the Perrin property and $2,788 as depreciation on the property using a declining balance method and a 15-year useful life. Petitioners showed a basis in the Perrin property of $105,853.81 and allocated $35,853.81 of this amount to improvements in computing depreciation. Also, on their Federal income tax return for 1962 petitioners deducted $3,850 as current rent and $4,200 as prepaid rent on the Neff property.

On their Federal income tax return for the calendar year 1963 petitioners deducted the full rental paid on the Neff property and deducted $4,959.87 as depreciation on the improvements on the Perrin property. In determining this depreciation petitioners used as the cost basis of

improvements the amount of $35,853.81 which had been used on their 1962 return and used a 150-percent declining-balance method, but used a 10-year useful life for the improvements.

Respondent in his notice of deficiency, among other adjustments, disallowed for the year 1962 the amount of $1,720 of the rental payments of $4,300 claimed by petitioners with respect to the Perrin property giving the following explanation:

It is established that 40% of the lease payments made by you prior to your exercise of an option to purchase Perrins property was to be applied to the purchase price of the property at the time the option was exercised. Therefore 40% of the total payments of $4,300.00, or $1,720.00, is disallowed as rental expense. This amount has been taken into consideration in determining the basis of the property, as shown in Exhibit A.

For the year 1962 respondent also disallowed $1,511.46 of the depreciation claimed by petitioners on the Perrin property with the explanation that the depreciable basis of the improvements was $29,178, and the estimated useful life of the improvements was 20 years. Respondent also disallowed $962.50 of the current year rental payments on the Neff property and the $4,200 advance payments, explaining that the advance payments were not deductible since they did not constitute an expense attributable to the current taxable year and giving the following explanation with respect to the disallowance of a portion of the lease payments for the current year:

As in the case of the lease agreement for the Perrins property, it has been determined that a percentage of the lease payments made on the Neff property are to be considered as applicable to the purchase price of the Neff property in the event you exercise an option to buy it. This 25% portion of total lease payments of $3,850.00 for the 11 months you leased the property in 1962 is disallowed as rental expense.

For the calendar year 1963 respondent disallowed a portion of the rental payments on the Neff property giving the same explanation as to the disallowance as was given for the year 1962 and he disallowed $2,818.04 of the depreciation claimed by petitioners for the year 1963 on the Perrin property giving the same explanation for the disallowance as was given for the year 1962.

OPINION

Respondent in support of the determination made in his notice of deficiency, argues that 40 percent of the rental paid by petitioners for the first 5 months of 1962 with respect to the Perrin property and 25 percent of the rental paid by petitioners in each of the years 1962 and 1963 with respect to the Neff property constituted a payment for an option to purchase each of those properties, and therefore is not prop-

erly deductible as rent under the provisions of section 162(a)(3), I.R.C. 1954.[2]

Respondent contends that his position is proper because of the provisions contained in the agreement between the Weavers and petitioners with respect to the Perrin property and the provisions in the lease agreement with respect to the Neff property that certain percentages of the rental shall be credited toward the purchase price of the property in the event the option to purchase the property is exercised. Respondent contends that *Oesterreich* v. *Commissioner*, 226 F. 2d 798 (C.A. 9, 1955), reversing a Memorandum Opinion of this Court, supports his position that the provisions of the Neff and Perrin leases with respect to crediting a certain portion of the rent to the purchase price of the property if the option to purchase is exercised requires the disallowance of that portion of the stated rental as a rental deduction.

Respondent misconstrues the holding of the court in *Oesterreich* v. *Commissioner, supra*. The issue in that case was whether a document designated as a lease for a period of 67 years with a right to receive conveyance of the land at the end of the 67-year period for the payment of the sum of $10 was in substance a sale of the property and not a lease. In discussing the issue the court stated that the document was in substance one of sale and purchase and not a lease and that therefore under the substance of the agreement, the taxpayer in that case was receiving the amounts paid by the so-called lessee in substance as payment for the property and not as rental payments. While that case reversed this Court's conclusion that the document there involved was in substance a lease and the payments were in substance rental payments, it did not disapprove of the position that this Court has taken in numerous cases that documents entitled leases with options to purchase are to be construed to be what they are in substance in determining whether payments thereunder are rental payments or are payments toward the purchase of the property. In *Karl R. Martin*, 44 T.C. 731, 740 (1965), affirmed on this issue 379 F. 2d 282 (C.A. 6, 1967), we pointed out that while the written agreement there involved was in form a lease with an option to purchase, we were not bound by the

---

[2] SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

\* \* \* \* \* \* \*

(3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

form of the agreement or the characterization thereof by the parties and stated:

Substance, rather than form, will be controlling in determining the tax effect of the transaction. * * * We must look to the intent of the parties in terms of what they intended to happen. For a general discussion of this rule, see *Oesterreich* v. *Commissioner*, 226 F. 2d 798. We should be concerned more with the practical effect of the transaction rather than with the technical effect of it. If we find from all the facts and surrounding circumstances that the parties intended the agreement to result in a sale of the property and it transfers substantially all of the accouterments of ownership, the transaction will be treated as a sale rather than a lease even though the parties intended that legal title to the property should not pass until the 6 months' holding period had expired.

This Court has determined in a number of cases that a contract in the form of a lease was in substance a sale where the contract contained an option to purchase with the entire amount of the payments designated as rental payments to be applied to the purchase price of the property. See *Earl L. Lester*, 32 T.C. 711, 721 (1959), and cases there discussed. See also *Kitchin* v. *Commissioner*, 353 F. 2d 13 (C.A. 4, 1965), affirming upon rehearing a Memorandum Opinion of this Court and withdrawing its opinion in the same case reported at 340 F. 2d 895. The opinion withdrawn by the Fourth Circuit in *Kitchin* v. *Commissioner*, reached a conclusion in accord with respondent's position in the instant case, that merely because payments designated as rental might at some future date be applied toward the purchase price of the property, the payments did not constitute rental payment when made. The principal factual distinction in this case and in *Kitchin* v. *Commissioner*, is that the total rental payments were to be applied toward the purchase price in the *Kitchin* case whereas in the instant case only a percentage of the rental payments was to be so applied. We do not consider this factual difference in the two cases to be a substantive distinction. Therefore, respondent's position in the instant case is directly contrary to our conclusion in the *Kitchin* case which was affirmed by the Court of Appeals upon rehearing. See also *Dill Co.*, 33 T.C. 196 (1959), affd. 294 F. 2d 291 (C.A. 3, 1961). Therefore, in accord with our holding in a number of cases and that of the Fourth Circuit in *Kitchin* v. *Commissioner*, 353 F. 2d 13, affirming a Memorandum Opinion of this Court, we conclude that an amount paid as rental of a property under a contract giving the lessor an option to purchase, will not be considered not to be a rental merely because the amount of the rental payments or a portion thereof will be credited on the purchase price of the property if the option to purchase is exercised. We adhere to our view that the substance of the transaction will be considered and whether an amount paid under the designation of rental payment is a part of the purchase price of the property or is a

rental payment, will be determined from the substance of the agreement in accordance with which the payment is made.

After considering the agreements respecting the two transactions here involved, we conclude that the substance of the agreement between petitioners and the Weavers was that petitioners were in fact purchasing the Perrin property. A specific provision of that agreement was that petitioners would exercise the option to purchase prior to June 1, 1962. Therefore, even though the lease which was assigned to petitioners by the Weavers did not require petitioners to purchase the property, petitioners were required to do so by their agreement with the Weavers. The facts also show that the portion of the claimed rental deduction with respect to the Perrin property which respondent disallowed was treated as part of petitioners' basis in the Perrin property for determining the allowable depreciation with respect to that property for the years 1962 and 1963. Petitioners have accepted respondent's determination of their cost basis of the entire Perrin property. They so stated in their petition and their attorney so stated at the trial of this case. It is therefore inconsistent for petitioners to accept respondent's determination of their cost basis of the Perrin property which includes the $1,720 of claimed rental deduction which was credited on the purchase price of the property, and at the same time contend that this amount is properly deductible as rent. However, we would not, because of this inconsistency only, conclude that the amount was in fact paid as part of the purchase price of the property. Our conclusion that respondent was correct in his disallowance of $1,720 of the payment designated as rent with respect to the Perrin property for the first 5 months of 1962 is based on the fact that the agreements which petitioners had made with respect to that property were in substance a purchase of that property in the year 1962 with 40 percent of the rental a part of the purchase price.

The situation is entirely different with respect to the Neff property. There was no agreement requiring petitioners to purchase that property. If petitioners chose to exercise the option to purchase the property there would be required a substantial additional payment over and above the credit from the rental payment. The facts which we have set forth are clear that the payments made by petitioners in the years 1962 and 1963 with respect to the Neff property were in their entirety rental payments. *Kitchin* v. *Commissioner, supra.* We therefore conclude that respondent was in error in disallowing any portion of the rental payments made by petitioners with respect to the Neff property which were for and applicable to the years 1962 and 1963.

It is not clear whether petitioners still contend that they should be entitled to deduct in 1962 the advance rental payment of $4,200

they made in that year to be applied to the last year's rental under a 5-year lease. If petitioners are still so contending, we do not agree with their contention. This Court has specifically held that even for a cash basis taxpayer, an advance rental is deductible only for the year to which it is applicable and is not deductible in the year in which paid if that year is different from the year to which the rent is applicable. See *University Properties, Inc.*, 45 T.C. 416, 421 (1966), affd. 378 F. 2d 83 (C.A. 9, 1967); *Lola Cunningham*, 39 T.C. 186 (1962); and *Harry W. Williamson*, 37 T.C. 941, 943 (1962). We therefore hold that respondent properly denied petitioners' claimed deduction for the $4,200 advance rental paid by petitioners in the year 1962 to be applicable to the last year of the 5-year term of the lease.

The final issue in this case involves the proper amount of depreciation deductible by petitioners in each of the years 1962 and 1963 with respect to the improvements on the Perrin property. There is no issue with respect to the method used by petitioners to compute depreciation on the improvements nor is there any issue with respect to the entire cost basis to petitioners of the land and improvements of the Perrin property. The two points of contention between the parties with respect to the proper amount of depreciation are the amount of the total purchase price which constitutes the cost of the improvements on the property and the useful life of these improvements to be used in computing depreciation. Both of these questions are purely factual.

Petitioners take the approach that if they can establish the fair market value of the land in 1962, the year in which the option to purchase the Perrin property was exercised, that value may be subtracted from the total cost basis to petitioners of the Perrin property to arrive at the value of the improvements. This approach to the problem is erroneous. Petitioners entered into the contract for the purchase of the Perrin property in 1960 and therefore the cost basis of the property to petitioners in 1962 is not necessarily the fair market value of that property in 1962 when petitioners exercised the option. In fact, respondent, through his experts, offered persuasive evidence to show that the cost basis of the property to petitioners in 1962 was substantially in excess of the fair market value of the property at that date, primarily because of the fast obsolescence of the improvements on the property between the time petitioners entered the contract under which they were required to exercise the option to purchase the property and the date the option was exercised.

The only other approach that petitioners took to the problem of the cost to them of the improvements on the Perrin property was to offer evidence of the replacement cost new of the building on the property. This replacement cost new of the building, when added to what petitioners contended to be the fair market value of the land of $50,000,

came to an amount approximating the cost basis to petitioners of the whole property. Even if the economic useful life of the building on the Perrin property when it was acquired by petitioners in 1962 more nearly approached its physical economic useful life than the facts in this case show to be the situation, petitioners' use of replacement cost new as the fair market value of the improvements without an adjustment for the fact that the building in 1962 was 15 years old, would be inappropriate. However, all the witnesses recognized that the building on the property was already becoming obsolete in 1962 and therefore its economic useful life was limited to much less than the physical economic useful life of the building would be. Respondent's expert witness specifically determined, stated, and used in making his evaluation of the portion of the cost basis of the property to be assigned to the improvements that the economic useful life of the improvements on the Perrin property was 10 years from the date petitioners acquired the property in 1962. Therefore petitioners' position as to the proper method of determining the portion of the cost basis of the Perrin property to be allocated to the improvements on the property is not supported by the facts of record in the case. Respondent offered the testimony of a well-qualified expert. This witness, using several accepted methods of valuation to arrive at the value of the land and improvements to use as a basis for allocating the cost of the property between the two, and a computation allocating the cost to petitioners of the Perrin property on the basis of the assessed value of the improvements as compared to the assessed value of the land, arrived at a cost basis to petitioners of the improvements on the Perrin property of $30,933. On the basis of the testimony of respondent's expert witness, as well as the other evidence in the record including the ratio between the assessed value of the land and the improvements shown on the records of El Dorado County, Calif., we conclude that the cost basis of the improvements on the Perrin property to petitioners in 1962 was $30,933. See *2554–58 Creston Corp.*, 40 T.C. 932, 939–940 (1963).

As we have previously stated, we were impressed with the qualifications and the testimony of respondent's expert witness. This witness concluded, after pointing out the changing situation in the area in which the Perrin property was located, that the economic useful life of the improvements on the Perrin property, when petitioners acquired the property in 1962, was only 10 years. The other evidence of record in this case likewise supports that conclusion. We, therefore, conclude that the proper useful life of the improvements to be used in computing the depreciation to be allowed petitioners on the Perrin property in the taxable years 1962 and 1963 is 10 years.

*Decision will be entered under Rule 50.*