Glynn W. Keeling v. Commissioner.
Keeling v. Commissioner
Docket No. 5560-68.
United States Tax Court
T.C. Memo 1971-224; 1971 Tax Ct. Memo LEXIS 108; 30 T.C.M. (CCH) 954; T.C.M. (RIA) 71224; September 1, 1971, filed. Henry Schwartz, II, 340 Tyler Bk. & Tr. Co. Bldg., Tyler, Tex., for the petitioner. *109 Frederick B. Strothman, for the respondent. STERRETT
Memorandum Findings of Fact and Opinion STERRETT, Judge: The respondent determined a deficiency in the Federal income tax of the petitioner of $3,187.78 for his taxable year ending December 31, 1966. We have before us three issues for consideration. First, we are to determine whether petitioner, during the calendar year 1966, actually or constructively, received rental income in the amount of $11,154.32. This requires us to determine if the transaction involved was in fact a lease with an option to buy or rather, as the respondent contends, an installment sale or a financing arrangement. Secondly, we are to determine whether petitioner's corporation, Reo Palm Isle Ballroom, Inc., taxable as a small business corporation, was entitled to deduct the legal and accounting expenses paid by it in the amount of $1,093.35. Finally, we are 955 to determine whether petitioner's small business corporation was entitled to a deduction for the rental expense paid by it in the amount of $2,200 for the fiscal year ending January 31, 1966, applicable to the first month of the following year. This last issue requires us first *110 to ascertain whether Reo Palm Isle Ballroom, Inc., was on the cash or accrual basis of accounting. Findings of Fact Some of the facts have been stipulated and the stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Glynn W. Keeling (hereinafter referred to as petitioner), whose legal residence at all times material hereto has been Longview, Texas, filed his Federal income tax return for the calendar year 1966 with the district director of internal revenue at Dallas, Texas. Petitioner is now and throughout 1966, was the president and sole stockholder of Reo Palm Isle Ballroom, Inc. (hereinafter referred to as Reo). Reo is in the business of operating a ballroom. It is open for business three nights a week and has a matinee on Wednesday. Reo was organized as a corporation under the laws of the State of Texas on February 3, 1964. The incorporators and initial directors were Jack B. Mosher (hereinafter referred to as Mosher), owner of Reo immediately prior to its incorporation, Robert R. Arms (hereinafter referred to as Arms), accountant for the business, and W. W. Keeling, father of the petitioner, who at all times and in all transactions *111 leading up to and including the organization and incorporation of Reo, represented the interests of petitioner and acted in the capacity of trustee on his son's behalf. At all times petitioner, and not his father, was the real party in interest and will be so treated for purposes of this decision. On February 24, 1964, Reo filed its election on Form 2553 with the district director of internal revenue, Dallas, Texas, to be taxed as a small business corporation. The election so filed was first effective for the fiscal year ended January 31, 1965. Reo duly filed its Federal income tax returns (Form 1120-S) for the fiscal years ended January 31, 1966, and 1967 with the district director of internal revenue at Dallas, Texas. On March 22, 1961, W. W. Keeling, the owner of a parcel of land located 5/10th of a mile outside the city limits of Longview, Texas, on a 3.57 acre tract of land, leased said land to Mosher for a period of 10 years with an option to purchase. Mosher exercised his option and purchased the property on May 24, 1962, for $8,100. On June 19, 1962, Mosher contracted for the construction of Reo at a cost of $75,000. In order to finance the construction Mosher borrowed $70,000 *112 from Republic National Life Insurance Company of Dallas, secured by a deed of trust on the property. On January 31, 1964, Mosher conveyed an undivided one-half interest in and to all such properties to W. W. Keeling, trustee, who purchased it on behalf of his son, the petitioner. The facts further indicate that W. W. Keeling was acquiring title as a trustee solely by reason of the petitioner's poor financial position, and that, as previously noted, in reality, petitioner was the real party in interest. The consideration consisted of $55,000 and the assumption by the trustee and his agreement to pay one-half the unpaid balance remaining on the mortgage on the real estate in the original amount of $70,000. Of the $55,000 consideration, $10,458.27 was paid in cash, and the remaining $44,541.73 in four noninterest-bearing-notes, payable at various times beginning May 1, 1964. W. W. Keeling, in addition to advancing the cash payment of $10,458.27, also loaned the petitioner $4,541.73 to be used for operating expenses. This loan was unsecured, and as of August, 1957, only two payments in the aggregate amount of $500 had been made by the petitioner on the note executed by him evidencing *113 the advances. In addition to the loan owed to his father, the petitioner was also subject to several Federal tax liens which had arisen through unrelated business activities due to the petitioner's nonpayment of income and cabaret taxes. He was paying $100 per month in an attempt to satisfy this liability. On February 3, 1964, following the above mentioned conveyance by Mosher to W. W. Keeling, Reo was incorporated. There-upon, W. W. Keeling, on February 18, 1964, conveyed the recently acquired one-half interest to the corporation in consideration for which Reo agreed to pay all of the indebtedness assumed, and the notes executed by W. W. Keeling at the time of the conveyance of the properties to him, the payment of which indebtedness and notes was guaranteed by petitioner. In addition the corporation issued 1,000 shares of its capital stock at a par value of $10 per share 956 to the petitioner. However, these shares were held by Mosher as security for the payment of the notes guaranteed by petitioner. Four days later, on February 22, 1964, Mosher also conveyed the remaining one-half undivided interest in such business to Reo, in consideration of the assumption by it and its *114 agreement to pay one-half of the unpaid balance owing on the mortgage on the real estate. In addition it likewise issued 1,000 shares of its capital stock at a par value of $10 per share to Mosher. [1]
Thereafter, sometime prior to July, 1965, Mosher, motivated by a desire to obtain cash, began negotiations with L. B. Billingsly (hereinafter referred to as Billingsly) and L. A. Pate, Sr. (hereinafter referred to as Pate) for the sale of all properties both real and personal belonging to Reo. The initial proposal involved the sale of the properties to Billingsley and Pate, who then would lease it back to the petitioner for a period of five years. Petitioner, uncertain about the advisability of the transaction, conferred with his accountant, Arms. Arms considered it a "bad deal." In light of this advice and at the insistence of the petitioner, it was agreed that an option to purchase would be included *115 in the lease so as to afford the petitioner an opportunity to buy back the property after the 5-year lease expired. The terms of the lease between petitioner and Billingsly and Pate having been agreed to, Reo entered into a contract of sale with Billingsly and Pate providing in part as follows: 1. The purchase price for said property is $141,001.47 payable as follows: (a) $141,001.47 in cash, of which $1,000.00 has been deposited by Purchaser with the undersigned, Central Abstract and Title Co., receipt of which is hereby acknowledged by the Principal Agent. (b) It is agreed by Seller and Purchaser that Purchaser may pay $60,000.00 cash and assume the following described indebtedness, to wit: (1) $57,001.47 to Republic National Life Insurance Company; (2) $24,000.00 due by Glynn W. Keeling to Purchaser herein * * *. * * * 17. Special Conditions. It is specifically understood and agreed that this contract shall be null and void and shall not be consummated unless a lease agreement is executed by the Purchaser to Glynn W. Keeling covering the above described property on the terms and conditions as set out in the lease attached hereto and marked "Exhibit A" and initialed *116 by the parties hereto including Glynn W. Keeling. It is further agreed that Jack B. Mosher, a principal stockholder of Seller, agrees to place with Purchaser the sum of $7,000.00 for the guarantee of the payment of all rentals due or to become due during the first year as provided for in the lease agreement. In the event the rentals are paid by the said Glynn W. Keeling as provided for in said lease for the first year, the $7,000.00 shall be refunded to Jack B. Mosher together with 4 percent interest from date of deposit. In the event Glynn W. Keeling defaults in the payment of any rent due under the rental contract during the first year, Jack B. Mosher shall have the right to make such payments and in the event he makes such payments the $7,000.00 shall not be forfeited to the Purchaser but the same shall be refunded to Jack B. Mosher together with the interest and in the event Glynn W. Keeling and/or Jack B. Mosher fail to meet the payments during the first year as provided for in said lease agreement, the $7,000.00 shall be forfeited in favor of Purchaser. Concurrent with the sales contract Reo furnished the purchasers with a warranty deed which provided in part as follows: *117 This deed is executed * * * subject to the terms of a Sales Contract made and entered into by and between Reo Palm Isle, Inc., and L. B. Billingsly and A. L. Pate, Sr., and the Lease Agreement made and entered into by and between Glynn W. Keeling and L. B. Billingsly and A. L. Pate, Sr., dated July 28, 1965. The January 31, 1966, small business Federal tax return of Reo shows no gain to the corporation on the above mentioned sale. It shows a sale price of $141,001.47 and an adjusted basis of $141,001.47, consisting of: Building & Real Estate Improve- ments
$113,180.84
Equipment
16,756.88
Real Estate 11,063.75
$141,001.47 The legal fees incurred in the sale were not applied to increase the basis or reduce the sales price. 957 Following the execution of the sales contract and in accordance therewith Billingsly and Pate leased the properties to petitioner for a period of 5 years at a monthly rental of $2,200, payable in advance beginning on the date of purchase of the property by the lessor. There was no language in the lease pertaining to the right, or lack of it, of the petitioner to renew the lease. The lease agreement provided in part: Lessee *118 agrees to carry total amount of $110,000.00 in fire and casualty insurance to protect lien holders as their interest may appear. Lessee is to carry a total amount of life insurance of $100,000.00 to protect lien holders as their interest may appear. (3rd) That the Lessee shall at his expense maintain in good repair the roof, foundation and exterior walls of the building. The Lessee shall maintain all glass including plate glass, and any special storefront or equipment and all personal property located therein. If Lessee leases an entire building unit then Lessee shall be responsible for keeping the roof clean and downspouts there-from open during the term of this lease. * * * (17th) It is specifically agreed by and between the Lessor and Lessee that out of the $2,200.00 paid by Lessee to Lessor as rent, Lessor shall place in a separate account the sum of $1,050.00 and such sum shall bear 4% interest in favor of the Lessee and such account shall be used as part of the purchase price under the terms of the Purchase Agreement between Lessor and Lessee as hereinafter set out. For and in consideration of the payment of rent and the agreement to pay by Lessee, Lessor grants unto *119 the Lessee the option and right to purchase the above described property together with all improvements located thereon and all personal property located therein for the sum of $141,001.47. In the event the Lessee exercises his option to purchase the above described property at the expiration of this lease, payment shall be made as follows, to-wit: The $69,300.00 held in escrow and special account by Lessor being the accumulation of the $1,050.00 plus 4% interest during said rental period, shall first be applied to the purchase price, the balance of $71,701.47 shall be paid to the Lessor by Lessee in monthly installments of $1,650.00 plus 1/12 of the taxes and insurance of each month. The payments to be applied first to interest, balance to principal and said indebtedness of $71,701.47 shall bear interest at the rate of 7% per annum and shall be evidenced by * * * [a] note which shall be secured by vendor's lien and deed of trust, from the date of such purchase until paid. In the event Lessee fails or refused to exercise his option to purchase the property under the option and the terms herein provided, the escrow money shall be applied as rent payments during the term of the rental *120 contract and this option and all rights thereunder shall terminate and be of no further force and effect. In the event Lessee desires to exercise this option he shall give Lessor written notice of his intention to do so within 30 days prior to the expiration of this lease. * * * Lessor grants to the Lessee the option of sub-letting this lease to a corporation in which Lessee owns stock in said corporation. * * * Lessee agrees to pay the increase of any assessment for taxes or other levies made by governmental agencies against the above described property. Following the sale and leaseback, the petitioner and Mosher executed an agreement which distributed the $60,000 received from the sale. It stated that all of the debts of the corporation not assumed and cancelled by Billingsly and Pate would be paid out of the $60,000 and the balance of the money would be paid to Mosher for his entire stock ownership in Reo, and such stock would be transferred to petitioner. Therefore, as of August 1, 1965, the petitioner owned 100% of the stock of Reo. In accordance with the aforementioned lease agreement, the petitioner immediately sublet the rented property to Reo. The corporation thereupon, *121 in satisfaction of the lease agreement, made all rental payments in advance, prior to the first of each month, directly to Billingsly and Pate. The payments for Reo's fiscal years ending January 31, 1966 and 1967 are as follows: July 30, 1965
$2,200
August 31, 1965
$2,200
September 30, 1965
$2,200
October 30, 1965
$2,200
November 30, 1965
$2,200
December 30, 1965
$2,200
January 31, 1966
$2,200
February 25, 1966
$2,200
March 31, 1966
$2,200
April 30, 1966
$2,200
May 31, 1966
$2,200
June 30, 1966
$2,200
July 28, 1966
$2,200
August 26, 1966
$2,200
September 28, 1966
$2,200
October 31, 1966
$2,200
December 1, 1966
$2,200
December 23, 1966
$2,200
These checks were deposited in the real estate account of Billingsly and Pate. 958 During the period leading up to the sale by Reo to Billingsly and Pate, the financial position of Reo was one of cash shortage; its bank account was frequently overdrawn. For the legal work involved in the sale and leaseback described above, John Ford (hereinafter referred to as Ford) of the law firm of Bean, Ford and Schleier, sent the petitioner and Mosher a fee statement of $718.35 consisting of: Conference with Pate, Mosher and Keeling
Preparation of Sales Contract, Lease Agreement, Deed and Bill of Sale
$200.00
Owner's Title Policy - $141,000.00
468.35
Mortgagee's Title Policy
15.00
Recording Releases, Assignments, Deeds and Deed of Trust
25.00
Telephone calls to Austin, Tyler and Longview 10.00
$718.35
*122 Included within this same statement was a fee of $250 discounted by 25 percent to $187.50, for legal work done in an attempted bank loan from the Longview National Bank. The total fee of $905.85 was paid with two Reo corporation checks, both dated July 30, 1965. Check no. 977 for $387.50 was signed by Mosher, and check no. 980 for $518.35 was signed by the petitioner. Opinion Issue 1 The respondent bases his assertion that the petitioner has received rental income of $11,154.32 on two alternative theories. He argues that the transaction was nothing more than a financing arrangement. This contention is based upon the theory that the petitioner was acquiring 100 percent control of the corporation through the use of a hybrid form of mortgage. Alternatively the respondent contends that the rental paid by Reo directly to Billingsly and Pate was for the benefit of the petitioner and therefore, in light of the "assignment of income" doctrine is income to the petitioner. Further, he asserts that the lease with option to buy from Billingsly and Pate to the petitioner was nothing more than an installment sale; the petitioner was acquiring title to, or an equity interest in, the property. *123 Therefore, by applying section 162(a)(3), I.R.C. of 1954, [2] the petitioner is not entitled to a corresponding rental deduction. Section 162(a)(3) states: SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - * * * (3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity. The finding of a financing arrangement would necessitate a determination that the sale by Reo of its assets to Billingsly and Pate was not in fact a sale, but rather a mere transfer to a strawman who holds legal title for security purposes only. The record does not justify reaching such a conclusion. There is no evidence to show that Billingsly *124 and Pate received anything less than full unrestricted legal and equitable title. The facts disclose that the initial acquisition of Reo's stock by petitioner occurred almost 2 years prior to the sale and leaseback. Further, the transaction here in question was initiated by Mosher, not petitioner. In fact the sale negotiations were apparently well along before petitioner even became aware of their existence. The purpose of the negotiations was to solve Mosher's problem, a need for immediate cash, and was unrelated to any need of petitioner's. This Court cannot, therefore, take it upon itself to ignore these facts in holding that the entire acquisition of stock and leasing of property was all done by the petitioner with the intent of acquiring control of the corporation. Nor is respondent's alternative theory well-founded. The facts repeated above cast doubt upon it. Further, it is unchallenged that, pursuant to a sublease from petitioner to Reo, Reo did in fact use the assets so subleased and did in fact garner the revenue therefrom. Accordingly, the benefit from the right to use the assets accrued directly to Reo and only indirectly to petitioner as Reo's sole shareholder. We *125 appreciate the respondent's position that at the taxpayer's insistence an option to purchase was added to the lease, implying a possible intent to reacquire. 959 However, the facts indicate that petitioner was in some financial difficulty owing money to both the Federal Government and his father. We feel that the inclusion of this option was nothing more than a reflection of petitioner's hope of reacquiring the property. As the Seventh Circuit pointed out in Breece Veneer & Panel Co. v. Commissioner, 232 F. 2d 319, 323 (C.A. 7, 1956), reversing an opinion of this Court: Manifestly, one who takes an option does so with the hope of exercising it, but the hope does not create an equity. In addition it should also be noted that the purchasers, Billingsly and Pate, did not contemplate a lease with an option to purchase upon first negotiating the sale and lease with Mosher. This is of significance in light of the language used by the court in Breece Veneer & Panel Co. v. Commissioner, supra, at 323 when it stated, "[the] intention of the parties cannot be determined unilaterally." This is even more forcefully demonstrated by the clause in the sales *126 agreement which required Mosher to deposit $7,000 as security for the petitioner's first year's rent. Obviously, the lessor had no confidence in the petitioner's ability to pay the rent let alone exercise the option. It seems extremely doubtful that the petitioner intended from the first to exercise the option when he was unable to liquidate his own liabilities. This Court has on many occasions noted that if title is taken or if an equitable interest is created in property for the benefit of the lessee then a transaction, though termed a lease, will be treated as a sale. The respondent raises several contentions in this regard. He submits that since a portion of the rental payments were applicable to the option, the rental exceeded the fair market value and thereby created an equity in the property in favor of the petitioner. Secondly, that the option price of $71,701.47 is far below the value of the property, thereby also indicating the creation of an equitable interest in favor of the petitioner, and finally that the lease agreement imposed many of the rights, risks and responsibilities that a purchaser of property would assume. On all three counts we feel the respondent is incorrect. *127 This Court in Norman Baker Smith, 51 T.C. 429, 438 (1968), stated: [We] conclude that an amount paid as rental of a property under a contract giving the lessee an option to purchase, will not be considered not to be a rental merely because the amount of the rental payments or a portion thereof will be credited on the purchase price of the property if the option to purchase is exercised. We adhere to our view that the substance of the transaction will be considered * * *. This case makes it clear that the mere application of a portion of the rental to the option provision does not create an equitable interest. Rather, it is the intent of the parties and the substance of the transaction which must govern. In regard to the respondent's second theory, that being the creation of an equitable interest through the low option price, we feel compelled to point to an appraisal prepared on May 6, 1970, on behalf of the petitioner by John B. Dickson. Dickson estimated the value of the property in 1970, the year the option could have been exercised, at a value of approximately $101,000. It is evident to this Court that with a fair market value of $101,000, the payment of an *128 additional $71,701.47 creates no substantial equity prior to exercise. Even if we disregard the appraisal value, as the respondent requests, and value the property at $141,000, we feel the required additional payment of over $71,000 clearly eliminates the possible creation of an equitable interest of such magnitude to make exercise of the option automatic in light of petitioner's meager financial position as of the time the option was granted. Again our decision in Norman Baker Smith, supra, is relevant wherein we stated: There was no agreement requiring petitioners to purchase that property. If petitioners chose to exercise the option to purchase the property there would be required a substantial additional payment over and above the credit from the rental payment. 51 T.C. at 439. In regard to respondent's last contention this Court finds little, if any, validity in the argument that the lease agreement's imposition of certain risks and responsibilities upon the lessee raises a presumption of sale rather than lease. The cases in this area have found for the most part that the existence of these risks and responsibilities were mere surplusage in determining *129 if in fact a sale or lease existed. Upon an examination of the entire record we conclude that the transaction is neither a financing arrangement nor an installment sale and therefore, we find for petitioner on this issue. 960 Issue 2 The petitioner on behalf of Reo admits to having erroneously deducted $187.50 of the $1,093.35 in question. Therefore, only the deductibility of the remaining $905.85 remains in issue. It is settled law that "[costs] connected with the disposition of a capital asset are * * * capital expenditures to be added to the taxpayer's basis, or offset against the sales price, rather than expenses deductible from ordinary income." Spangler v Commissioner, 323 F. 2d 913, 921 (C.A. 9, 1963). Therefore, if the expenses involved herein are expenses of the sale by Reo to Billingsly and Pate they should be added to the corporation's basis in the property or reduce the selling price. This determination revolves around a factual question. As the court stated in Industrial Aggregate Company v. United States, 284 F. 2d 639, 645 (C.A. 8, *130 1960), "[practicality] and substance are to be recognized. The test which appears to have been established is that of primary purpose." The facts indicate that an itemized bill of $905.85 was sent to Mosher and the petitioner for legal work performed by John Ford. The itemization indicated that $718.35 was charged for work done in connection with the sale and leaseback of the property. The respondent contends that (1) since the bill was made out to Mosher and the petitioner personally, rather than the corporation, the expense must have been personal in nature, and (2) the payment of the entire $905.85 with two separate checks on the same day indicates that the petitioner has not sufficiently demonstrated that the payment was in response to the charges. The first contention could possibly have some merit if the bill had been in the petitioner's name only. Here however, it was in the names of the corporation's only two shareholders, indicating that it involved corporate business. The second contention, upon close examination, is also of little merit. The two checks, nos. 977 and 980, are in amounts of $387.50 and $518.35, respectively. The entire first page of the statement *131 and the first item on the second page involve the services rendered in preparing certain legal documents. The total amount charged for this preparation is $387.50, identical to the amount stated in check no. 977. The remainder of the statement involves expenses paid by the attorney on behalf of Reo. They total $518.35, the amount stated on check no. 980. Illogical as this may seem the connection between the payment and the bill is evident. In short, the facts clearly indicate the occurrence of a sale by the corporation, and it seems logical to conclude that the expenses involved were part and parcel of that sale. We must also point out that the authorities indicate that the expenses enunciated above are for the most part deductible selling expenses. See Fred Wong Gunn, 49 T.C. 38 (1967); Samuel C. Chapin, 12 T.C. 235, affirmed, 180 F. 2d 140 (C.A. 8, 1950); Victoria Paper Mills Co., 32 B.T.A. 666, affirmed 83 F. 2d 1022 (C.A. 2, 1936). However, the fee for the preparation of the lease agreement is not an expense associated with the disposition of a capital asset by Reo, but rather is an expense of the petitioner *132 involving his own lease agreement with Billingsly and Pate. Therefore of the aggregate $200.00 allocated to the preparation of the sales contract, lease agreement, deed and bill of sale, we allow the capitalization of $150.00. Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930). It follows that of the $718.35, $668.35 is a capital expenditure which should be added to the basis of the property, or offset against the selling price. The Federal tax return of Reo indicates that there was no gain or loss on the above mentioned sale. However, the expenses incurred were not applied to reduce the sales price or increase the basis. This adjustment is therefore required. In so doing the sale by Reo to Billingsly and Pate produces a loss. This loss is deductible as an ordinary loss in accordance with the provisions of section 1231(a). In regard to the remaining expense of $187.50, the facts indicate that Ford prepared the necessary documents and initiated the negotiations with the Longview National Bank in the hopes of obtaining a loan which as it happened never materialized. It seems evident to this Court, as we noted earlier, that this expense as well as those listed above *133 was initiated by and on behalf of the corporation. The fee statement was addressed to the two shareholders of the corporation, the statement lists as a service performed a conference with petitioner, Mosher, Arms and the Longview National Bank. It seems illogical to hold, 961 as the respondent requests, that these expenses were for and on behalf of the petitioner only. Though the petitioner may not have destroyed all possible negative inferences he has in our opinion satisfied his burden of proof. See George W. Van Vorst, 22 B.T.A. 632, affirmed 59 F. 2d 677 (C.A. 9, 1932). Therefore, the expenditure in the attempted loan acquisition is deductible as an ordinary and necessary business expense. Accordingly, under the facts and circumstances, we conclude that Reo is entitled to deduct the legal expenses as hereinbefore set forth. Issue 3 The petitioner alleges that Reo was on the cash receipts and disbursements method of accounting, and therefore, the rent applicable to February 1966, paid on January 31, 1966, was deductible as an ordinary and necessary business expense in the corporation's Federal income tax return for the year ending January 31, 1966. *134 This contention is not supported by the facts presented. The articles of incorporation of Reo indicate that its principal function was the conducting of a "ballroom or dancehall." However, the Federal income tax return of the corporation discloses that it sold some type of goods and that the purchase and sale of these goods were kept on the accrual method of accounting as required by the regulations. [3] In addition, the petitioner has not produced any form of evidence to substantiate his position. The records of the corporation were not introduced and the tax returns are not enlightening. The facts also indicate that the petitioner's accountant, Arms, called as a witness, was never asked by petitioner's counsel whether the corporation was on a cash or accrual method of accounting. The burden of proof lies with the taxpayer and in this case the taxpayer has not overcome that burden. Therefore Reo is, as the respondent *135 contends, considered to be on an accrual method of accounting. With this determination in mind the law is clear; an accrual basis taxpayer deducts all expenses in the year applicable and not when paid. [4] The result in this case is therefore apparent; the rental payment on January 31, 1966, since applicable to the corporation's next fiscal year, is not deductible until that year. Decision will be entered under Rule 50. Footnotes
1. This Court finds the issuance of equal amounts of stock to the petitioner and Mosher to be unusual in light of the fact that the interest conveyed by W. W. Keeling to Reo on the petitioner's behalf was subject to a greater liability. The facts presented are of no help on this point.↩
2. All section references are to the Internal Revenue Code of 1954, unless otherwise indicated.↩
3. Sec. 1.446-1(c)(2)(i)↩. In any case in which it is necessary to use an inventory the accrual method of accounting must be used with regard to purchases and sales * * *.
4. Sec. 1.461-1(c)(1)(ii). * * * Under such a method, deductions are allowable for the taxable year in which all the events have occurred which establish the fact of the liability giving rise to such deduction and the amount thereof can be determined with reasonable accuracy.↩