**PERMA–ROCK PRODUCTS, INC.**

v.

**The UNITED STATES of America.**

**Jack O. and Sophie CHERTKOF**

v.

**The UNITED STATES of America (two cases).**

**Civ. Nos. 21408–K, 21409–K, and 70–403–K.**

United States District Court,
D. Maryland.

Sept. 28, 1973.

Edward S. Smith, James J. Winn, Jr., Baltimore, Md., for plaintiffs.

Edward J. Snyder, Dept. of Justice, Washington, D. C., Michael E. Marr, Asst. U. S. Atty., Baltimore, Md., for defendant.

FRANK A. KAUFMAN, District Judge.

In these three cases, Perma-Rock Products, Inc. ("Perma-Rock"), Jack O. Chertkof ("Jack") and Sophie Chertkof (the two Chertkofs are sometimes hereinafter referred to as "the Chertkofs") seek the refund of federal income taxes under 28 U.S.C. § 1346(a)(1). Certain of the issues originally posed in these cases are not discussed herein as they have been otherwise determined or handled.[1]

---

1. On October 29, 1971, after hearing oral argument in Civil No. 70–403–K on cross-motions for summary judgment with regard to the issue of whether a distribution by E & T Corporation to Jack Chertkof in redemption of his stock was taxable to the Chertkofs in 1965, this Court indicated to counsel at that time that in its opinion 1965 was not the proper year to tax the questioned distribution. This Court hereby adopts those earlier indicated views and concludes that the distribution to Jack by E & T in redemption of Jack's two shares of stock was taxable to Jack in 1966. See Stipulation of Agreed & Disagreed Facts, filed April 2, 1971 (hereinafter Stip. # 1), ¶¶ 29–34, Jack Chertkof's affidavit of August 30, 1971 and Ex. A attached thereto, and Ex. 18. See letter from this Court to counsel dated December 30, 1971.

Jack's E & T stock was not redeemed until February 28, 1966 and Jack received no consideration therefor until sometime later in 1966. An agreement (Ex. 18, ¶ 2) dated July 12, 1965 provided only that E & T would redeem Jack's stock sometime in the future. A cash basis taxpayer, such as Jack was in 1965 (Stip. # 1, ¶ 3), realizes income when it is received, and not when a promise to pay in the future has been made. J. Mertens, Law of Federal Income Taxation § 12.39 (1972 ed.). Because Jack received no cash or its equivalent in 1965 for the redemption of his E & T stock which occurred in 1966, 1965 was not the proper year in which to tax E & T's 1966 distribution to Jack in redemption of the latter's E & T stock. See James T. Moore, Sr., 20 CCH Tax Ct.Mem. 1346 (1961); Treas.Reg. 1.446–1(c)(1)(i).

The Chertkofs contend in these cases that the Internal Revenue Service (IRS) erroneously treated (1) in 1964 a $2000 payment to Jack by Perma-Rock as a dividend rather than an ordinary and necessary business expense; (2) in 1964, Perma-Rock's distribution to Jack of $31,500 cash and a $42,000 secured note in redemption of all of Jack's Class B, non-voting stock as a dividend to the extent of Perma-Rock earnings and profits rather than amounts distributed in partial liquidation under Section 346(a)(2) of the Internal Revenue Code of 1954 (Code); and (3) in 1965, a $7000 payment on Jack's $42,000 note from Perma-Rock as a dividend.[2] In both 1964 and 1965 the Chertkofs prepared their individual income tax returns on the cash receipts and disbursements method.[3]

█ Perma-Rock is suing herein for refund of federal income taxes and interest paid by it in fiscal years ended September 30, 1962, September 30, 1964, and September 30, 1965. The issues in dispute between Perma-Rock and the IRS are: (1) whether two payments by Zonolite Division, W. R. Grace & Co. (Zonolite) to Perma-Rock of $5000 on December 5, 1963 and of $2717.90 on October 10, 1964 were rental income to Perma-Rock when received or the proceeds of sale; (2) whether $2000 paid by Perma-Rock to Jack on September 10, 1964 as travel expense was an ordinary and necessary business expense of Perma-Rock under Section 162 of the Code; (3) whether $1680 paid by Perma-Rock

to Jack as interest[4] on the $42,000 secured note distributed to him in redemption of his entire Class B stock was deductible as an interest expense in fiscal 1965.[5] In deciding all of those issues in this case, this Court notes carefully Mr. Justice Cardozo's statement that a ruling by the IRS has a presumption of correctness and those challenging it have the burden of proving it wrong. Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933).

### A. *Sale or Rent*

On December 5, 1963, Perma-Rock, engaged in the business of processing, storing and selling light-weight aggregate and related building materials,[6] leased to Zonolite certain real property consisting of its plant office and laboratory and also certain machinery and equipment located in that real property, for a term of one year commencing January 1, 1964.[7] Upon execution of the lease, Zonolite was required to pay Perma-Rock $5000 as a "rental deposit" "to secure payments of rental". The lease provided that at the end of the one-year term, Zonolite would have an option to purchase all of the leased machinery and equipment for $30,000, less credits for both the $5000 rental deposit and all prior rental payments;[8] and further provided that if Zonolite did not exercise its option to purchase, the $5000 rental deposit would be forfeited to Perma-Rock in consideration of Perma-Rock's release of Zonolite from any claims arising out of any injury or damage result-

---

The Government (at Tr. 76–78) also conceded that 140 of Jack's Perma-Rock shares were physically turned in. That concession rendered moot one or more additional issues originally stated in these cases.

2. The Chertkofs apparently treated the $7000 payment as a return of capital with no income tax effect. *See* Ex. 5.

3. Stip. # 1, ¶ 3.

4. *See* 26 U.S.C. § 163(a).

5. Issues concerning loss carrybacks of Perma-Rock to fiscal years ending September 30, 1962 and September 30, 1964 depend upon the resolution of issues related to Perma-Rock's tax return for its fiscal year ended September 30, 1965. Stip. # 1, ¶ 28.

6. Stip. # 1, ¶ 7.

7. Ex. 6.

8. Ex. 6, ¶¶ 2 and 4.

ing from Zonolite's operations during the one-year lease.[9] Nowhere in the lease was there any specific or general provision permitting Zonolite to recover its $5000 rental deposit. However, it is arguable that if the leased premises had been taken or destroyed by public authority, Perma-Rock may have been required to return to Zonolite[10] that $5000.

On November 30, 1964, Zonolite notified Perma-Rock of its intent to exercise the purchase option. In accordance with that exercise by Zonolite, the leased equipment and machinery was subsequently sold to Zonolite by Perma-Rock in accordance with the December 5, 1963 lease agreement.[11] The $30,000 paid by Zonolite to Perma-Rock for the machinery was divided as follows:[12]

| ITEM | DATE | AMOUNT | EXPLANATION |
|---|---|---|---|
| 1 | 12/12/63 | $ 5,000.00 | Security deposit credited toward the purchase price. |
| 2 | 4/10/64 | 3,247.60 | Rental payment credited toward the purchase price. |
| 3 | 7/10/64 | 3,337.60 | Rental payment credited toward the purchase price. |
| 4 | 10/10/64 | 2,717.90 | Rental payment credited toward the purchase price. |
| 5 | 12/29/64 | 15,696.90 | Final balance due on the purchase price after credit for prior rental payments and security deposit. |

The parties have agreed that Items 2 and 3 were rental income reportable by Perma-Rock as ordinary income in the fiscal year ended September 30, 1964[13] and also have agreed that Item 5 was reportable as part of the proceeds of sale of Perma-Rock equipment in the fiscal year ended September 30, 1965.[14] The IRS included Items 1 and 4 as rental income to Perma-Rock in the fiscal years

9. Ex. 6, ¶ 7. Provided the option to purchase was exercised, Zonolite also was given certain options to renew its lease of the real property for terms ending in 1965. Those lease renewal rights did not exist in the event of Zonolite's failure to exercise its option to purchase. Ex. 6, ¶¶ 6, 7. Paragraph 7 provides, in full:

In the event Tenant does not exercise its option to purchase equipment in accordance with paragraph 4 above, Tenant shall have no right of renewal of the lease on the plant, but rather Tenant shall vacate the premises on or before December 31, 1964, and agrees that it will fully co-operate with Lessor in preparing the plant facilities, equipment and plant operations for whatever change-over may be agreed upon by the parties. In this event, the Five Thousand ($5,000.00) Dollar rental deposit paid by Tenant to Lessor hereunder shall thereupon be forfeited to Lessor, and Lessor covenants and agrees, in consideration of said payment, to hereby release Tenant, its agents and employees, from any and all claims, demands, suits or cause of action arising out of any injury or damage resulting from the operation of Tenant in Lessor's plant for the initial one year term.

10. *See* Ex. 6, ¶ 3(d).

11. Stip. # 1, ¶ 17.

12. Stip. # 1, ¶¶ 17, 22; Stipulation of Facts No. 2, ¶ 4, filed October 20, 1972 (hereinafter referred to as Stip. # 2). The latter stipulation reveals that the $5000 deposit was received by Perma-Rock on December 12, 1972, not December 5, 1972.

13. Stip. # 1, ¶ 24.

14. Stip. # 1, ¶¶ 17, 25.

when received.[15] Perma-Rock contends that Items 1 and 4 were part of the proceeds of the sale of the equipment.

The standards for determining whether Items 1 and 4 should be characterized as rental income or the proceeds of sale are set forth in Kitchin v. Commissioner, 353 F.2d 13 (4th Cir. 1965) in which the Fourth Circuit, en banc, in an opinion by Judge Bell unanimously recalled a three-judge panel opinion, also written by Judge Bell which had reached a different conclusion. Kitchin v. Commissioner, 340 F.2d 895 (4th Cir. 1965). In *Kitchin*, taxpayers leased equipment to a construction firm under an agreement giving the lessee, at any time during the rental period, an option to purchase the leased equipment at a specified price, with all prior monthly rental payments credited against the purchase price. The taxpayers excluded the monthly rental payments under the lease from gross income, transferring those amounts to a special suspense account to be held in abeyance for income tax purposes until they were advised by the lessee whether the latter would exercise the purchase option or let it lapse. The Government treated all the monthly rental payments as rental income on the date such payments were received. Those dates occurred before the taxpayers were notified of whether the lessee desired to exercise its purchase option. The Fourth Circuit, en banc, upheld the Government's position, distinguishing the case of Virginia Iron Coal & Coke Co. v. Commissioner, 99 F.2d 919 (4th Cir. 1938), cert. denied, 307 U.S. 630, 59 S.Ct. 833, 83 L.Ed. 1513 (1940), which held that "straight option" payments made for the privilege of extending an option to purchase, and credited toward the purchase price if the option was exercised, could be deferred by the selling taxpayer for income tax purposes and not be characterized as either option income or part of the proceeds of sale (if the option were exercised) until a decision whether or not to exercise the option was made. The en banc Court wrote in *Kitchin* (353 F.2d at 14–15):

\* \* \* That case [*Virginia Coal*] involved the so-called "straight" option. The taxpayer had entered into an option to sell mining lands at an agreed price. The option was to remain open for a period of years upon payment of an annual amount which was to be credited on the purchase price or forfeited if the option was not exercised. The seller reported the payments as "option income" in the year that the holder notified the taxpayer in writing that the option would not be exercised. While it is true as a matter of logic that the same difficulty arises in prospectively categorizing the payments in the case before us as existed in the Virginia Coal case, nevertheless, we are convinced that there are differences in the underlying economic consequences to the parties in such a "straight" option and in the average lease-option contract involving the concurrent use of the property by the lessee/buyer which justify a distinction for purposes of taxation. In a sense, the straight option exists in an economic vacuum. Its creation does not normally cause any appreciable change in the ownership or possession of the property. At its inception there are no tax consequences for the purchaser of the option. If the option is exercised, the consideration paid for the option is likely to represent only a minor fraction of the consideration received for the entire transaction, but in any event there is no tax-necessity of differentiating between the amount paid for the privilege of the option and that paid as consideration for the thing optioned. Further the issuance of straight options are likely to be isolated transactions. Because straight options are thus insulated from other tax occurrences, they present substantially different problems with regard to tax administration than do the periodic payments involved in the nor-

15. Stip. # 1, ¶ 23.

mal lease-option agreement which is so common in modern business.

Since the lease-option contemplates possession by the lessee (optionee) the periodic payments are likely to represent a much larger portion of the total transaction. In many cases these payments will represent the total consideration. Thus if the lease runs until the option price is paid in "rent", half the total consideration will have been paid at points in time closer to the inception than the termination of the transaction. Failure to exercise the option in long term lease-contracts would result in bunching of income in the year the option expires and may result in a heavy tax burden on the lessor.

Failure to characterize the transaction in the beginning would not only interfere with the recognition of income but also with the allowance of a deduction for depreciation. Only the "owner" may take the depreciation deduction. If ownership is left in doubt until exercise or forfeiture of the option, then depreciation must also be held in suspense. This would involve a change in the practice of allowing the depreciation deduction only in the year in which the wear and tear occurred. Mertens § 23.18. The principle behind this yearly deduction for depreciation is that the deduction roughly corresponds to the income produced in the process of that wear and tear. Massey Motors, Inc. v. United States, 364 U.S. 92, 104, 80 S. Ct. 1411, 4 L.Ed.2d 1592 (1959). If characterization is delayed and the option is forfeited no violence is done to this principle. Depreciation could be applied against the rental income. If the option is exercised, however, there is a totally different situation. The lessee has no deferred income; depreciation would be charged against current income which is unrelated to the wear and tear.

Finally, we think it clear in this case that the periodic payments represented a fair return for the use of the equipment and that the contracts were exactly what they purported to be; i. e., leases with options to purchase and not disguised sales. Consequently the Tax Court correctly held that the payments were ordinary income in the years received. Rotorite Corp. v. Commissioner, 117 F.2d 245 (7 Cir. 1941). [Footnotes omitted.]

In Kitchin, the en banc Court set forth four basic reasons for characterizing the lease-option payments in that case as rental income when received: (1) if the lease-option payments were not characterized as rental income when received, but were held in abeyance for income tax purposes until a final decision as to whether or not to exercise the option was made, then the administration of the tax laws based upon the firmly embedded general principles of annual accounting and the recognition of income when received would be interfered with; (2) lease-option payments are likely to represent a large part of the purchase price so that failure to exercise the purchase option would often result in a bunching of income to the lessor in the year the option expired; (3) failure to characterize the payments when made would interfere with proper depreciation deductions; and (4) the questioned payments represented a fair return for the use of the equipment and thus the lease-option contracts were not disguised sales contracts. Those four reasons compel the conclusion that Items 1 and 4 were properly characterized by the IRS as rental income when received and not as the proceeds of sale.

If Item 1 were not characterized as rental income when received but were held in abeyance for income tax purposes until Zonolite decided whether or not to exercise its option, then some interference with the principle of recognizing income when received and the creation of tax administration problems would occur. Perma-Rock received Item 1 in its fiscal year ending September 30, 1964, but Zonolite made no decision as to whether or not to exercise the option

until Perma-Rock's fiscal year ending September 30, 1965.[16]

■ Item 4 was received by Perma-Rock during the same fiscal year as Zonolite's decision to exercise its option. Thus, no seeming interference with annual tax accounting principles or the principle of recognizing income when received would occur if Item 4 were deemed the proceeds of sale. There could, however, be minor problems with regard to proper allocation between Perma-Rock and Zonolite of depreciation deductions on the leased machinery or equipment during 1964 if Item 4 was not recognized as rental income when received under a theory that the ownership of the leased machinery and equipment was suspended for income tax purposes until Zonolite decided whether or not to exercise its option. In any event, for other reasons stated in the en banc decision in *Kitchin*,[17] this Court concludes that Item 4 was properly characterized as rental income.

■ If Zonolite had not exercised its option to purchase when the lease terminated on December 31, 1964,[18] and if both Items 1 and 4 were not recognized as income for tax purposes until Zonolite made its decision not to exercise its option,[19] then both would have been bunched into income in the fiscal year ending in September, 1965. On the other hand, if both items are treated as rental income in the fiscal year of receipt, Item 1 would be included in the fiscal year ending September 30, 1964. The avoidance of income bunching to the lessor was one of the reasons given by the Fourth Circuit in its final decision in *Kitchin* for concluding that lease-option payments in that case were rental income. But most important of all, the record in this case establishes that Items 1 and 4 represented payments of fairly bargained amounts relating to the use of the leased machinery and equipment and that on an overall basis the lease-option contract between Perma-Rock and Zonolite was not a disguised sales contract. The lease provided for certain minimum rental payments plus a surcharge based upon the quantities of perlite shipped from the leased plant.[20] Nothing in the record indicates that those rents were not bargained for at the market price. Moreover, Zonolite's delay in exercising its purchase option,[21] and Jack's search for other possible purchasers of the leased machinery and equipment,[22] is further evidence that the lease-option was not a disguised sales contract. Item 1, *i. e.*, the $5000 deposit, constituted a reasonable sum to protect Perma-Rock against Zonolite's nonpayment of rent and not impossible bankruptcy, and also, notably, to protect Perma-Rock against damage to the leased property, including

---

16. The delay in *Kitchin* could not have extended beyond the third tax year. Kitchin v. Commissioner, 353 F.2d *supra* at 14. Herein, the maximum delay involves an even shorter period. Nevertheless, Judge Bell's comment (at 14) is applicable:

> * * * While a short delay may not be upsetting either to the taxpayer or to the government's administration of the tax laws in exceptional cases, in general our tax laws are based upon the principle that only a system of annual accounting will produce a regular flow of income to the treasury and permit the application of methods of accounting, assessment and collection capable of practical application by both the government and the taxpayer. Mertens § 12.07.

17. The rental agreement in *Kitchin* did not require any security deposit.

18. Ex. 6, ¶ 4.

19. Perma-Rock had unrestricted use of Items 1 and 4 when received. The question of whether failure to recognize those Items as income to Perma-Rock when received would be contrary to the "claim of right" doctrine established by Mr. Justice Brandeis in North American Oil Consolidated v. Burnet, 286 U.S. 417, 424, 52 S.Ct. 613, 76 L.Ed. 1197 (1931), is not reached here. *See* the discussions in Kitchin v. Commissioner, 340 F.2d *supra* at 899–900, and in Gilken Corp. v. Commissioner, 176 F.2d 141, 144–145 (6th Cir. 1949).

20. Ex. 6, ¶¶ 2(a) and (b).

21. *See* Tr. 32, 33.

22. Tr. 33.

the leased equipment,[23] and thus was not, in disguise, an item related to a sale agreement rather than to a rental agreement. Accordingly, under the standards set forth in *Kitchin* for determining whether lease-option rental payments should be deemed rent when received or the proceeds of sale, this Court concludes that both Items 1 and 4 were rental income to Perma-Rock when received.[24]

## B. *Personal or Business Expense*

Jack was the sole stockholder[25] of Perma-Rock after April 6, 1964.[26] Jack testified that when Zonolite gave no indication of whether it would exercise its option to purchase the leased machinery and equipment in the second or third quarter of the lease term, he became concerned that Zonolite might not exercise the option and began looking for an alternate purchaser.[27] He spoke to certain persons in the perlite business who informed him that one of the only places to sell perlite machinery and equipment was the Middle East.[28] Jack subsequently contacted certain persons overseas whom he had reason to believe might be interested in purchasing the leased equipment and machinery sometime in June or July, 1964.[29] In late August, 1964, Jack wrote two brief letters to potential purchasers in Israel and Greece.[30] The letters gave no detail as to what might be for sale; they simply referred to the possibility of establishing perlite operations in Israel and Greece. Jack had made arrangements to fly abroad with his wife Sophie before writing those two letters in late August.[31]

Jack and Sophie flew to Israel from Baltimore, Maryland sometime in September, 1964.[32] They spent about 12 days in Israel, about 3 days in Athens, Greece, and thereafter about 3 or 4 weeks on a tour of Europe before flying back to the States.[33] In Israel, Jack spoke with one potential customer during parts of three or four days.[34] However, Jack decided not to push the possible sale of the leased machinery and equipment in Israel because he thought such a purchase would be disadvantageous to the purchaser.[35] Jack spent about one-half day in Greece discussing business and learned his one Greek contact was interested in selling him ore and not in purchasing Perma-Rock's machinery.

The total cost for the trip abroad for the Chertkofs was about $6000.[36] Per-

23. *See* n. 9 *supra.*

24. Perma-Rock has cited Greentree v. Fahs, 56–1 T.C. ¶ 9206 (S.D.Fla.1955), to support its claim that the $5000 was not rental income but just a security deposit. That case, however, is inapposite because there are indications in the jury charge in that case that the lease there in question provided for a *return* of the deposit if an option to purchase was not exercised and no conditions of the lease were violated. Cases supporting this Court's treatment of the $5000 as rental income include: Gilken Corp. v. Commissioner, 10 T.C. 445, aff'd, 176 F.2d 141 (6th Cir. 1949) ; Ericksen v. Commissioner, T.C. Memo, 1964–111. Both *Gilken* and *Ericksen* involved rental security deposits. In *Ericksen* there was a provision for either application as rent or return of the security deposit under certain conditions. *See also* Lester v. Commissioner, 32 T.C. 711 (1959).

25. Jack was also seemingly an officer and director of Perma-Rock. *See* Ex. 8 and Ex. 9.

26. Stip. # 1, ¶ 16.

27. Tr. 32–33, 36–37.

28. Tr. 33.

29. Tr. 34–35.

30. Defendant's Exhibits 1 and 2.

31. Tr. 61.

32. *See* Defendant's Ex. 1.

33. Tr. 50, 52, 56.

34. Tr. 53. Perhaps he also spent parts of certain other days in Israel in business discussions. Tr. 52, 56.

35. Tr. 42.

36. Tr. 39.

ma-Rock paid for $2000 of the Chert-kofs' travel expenses and deducted that amount as a business expense in its fiscal year ended September 30, 1964.[37] The IRS determined that the $2000 travel expense was not deductible by Perma-Rock and constituted a dividend to Jack in the calendar year 1964.[38]

Section 162(a) of the Internal Revenue Code provides that "[t]here shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business . . . ." Mr. Justice Cardozo set the guidelines for determining what is an "ordinary and necessary" expense in his opinion in Welch v. Helvering, 290 U.S. 111, 54 S. Ct. 8, 78 L.Ed. 212 (1933). See also Commissioner v. Lincoln Savings & Loan Ass'n, 403 U.S. 345, 91 S.Ct. 1893, 29 L.Ed.2d 519 (1971). In Welch, the taxpayer had been a secretary of a corporation engaged in the grain business. That corporation went bankrupt. When the taxpayer contracted with a new corporation to purchase grain for it on a commission basis, he decided to pay the discharged debts of the old corporation to establish some goodwill. The Commissioner ruled that those payments were not deductible as ordinary and necessary expenses, but were capital expenses for the development of goodwill. In upholding the Commissioner's ruling, the Court noted that the Commissioner's rulings have a presumption of correctness, and the taxpayer has the burden of proving it to be wrong. The Court then stated that the payment of the discharged debts might be deemed necessary, at least in the sense that they were appropriate or helpful to the taxpayer's business. The Court, however, upheld the Commissioner's determinations that the debt repayments were not "ordinary". In so holding, the Court stated:

\* \* \* Now, what is ordinary, though there must always be a strain

of constancy within it, is none the less a variable affected by time and place and circumstance. Ordinary in this context does not mean that the payments must be habitual or normal in the sense that the same taxpayer will have to make them often. A lawsuit affecting the safety of a business may happen once in a lifetime. The counsel fees may be so heavy that repetition is unlikely. None the less, the expense is an ordinary one because we know from experience that payments for such a purpose, whether the amount is large or small, are the common and accepted means of defense against attack. Cf. Kornhauser v. United States, 276 U.S. 145, 48 S.Ct. 219, 72 L.Ed. 505. The situation is unique in the life of the individual affected, but not in the life of the group, the community, of which he is a part. At such times there are norms of conduct that help to stabilize our judgment, and make it certain and objective. The instance is not erratic, but is brought within a known type. [290 U.S. at 113–114, 54 S.Ct. at 9]

Mr. Justice Cardozo further stated the appropriate test for reviewing the Commissioner's determination that an expense was not "ordinary and necessary" (at 115, 54 S.Ct. at 9):

\* \* \* Unless we can say from facts within our knowledge that these are ordinary and necessary expenses according to the ways of conduct and the forms of speech prevailing in the business world, the tax must be confirmed. \* \* \*

Mr. Justice Cardozo also emphasized (at 115, 116, 54 S.Ct. 8) that the determination of what constitutes an ordinary and necessary business expense should be made on a case-by-case basis.

In this case, Jack's expenses relating to discussions in Israel and Greece with persons to whom Perma-Rock might sell

---

37. Stip. # 1, ¶ 26.

38. Stip. # 1, ¶ 27.

its leased machinery and equipment if Zonolite failed to exercise its option were necessary to Perma-Rock under the standards set forth in *Welch* in the sense that they were helpful in attempting to sell its machinery and equipment while removing itself from the business of processing perlite. However, this Court cannot conclude from facts in the record that those expenses were "ordinary and necessary expenses according to the ways of conduct and the forms of speech prevailing in the business world . . . ."

 If Perma-Rock in fact sent Jack abroad, it did so with minimal investigation into the likelihood that the potential purchasers of the machinery and equipment in Israel and Greece were seriously interested in buying. In fact, the one person Jack met in Greece was not even interested in buying but wanted to sell Perma-Rock ore. Even the potential Israeli purchaser with whom Jack had discussions was not, according to Jack's own testimony, in a position adequately to use the machinery and equipment if purchased. Thus, Jack did not push those discussions further. The record shows that there was minimal effort by Perma-Rock realistically to assess the problems involved in selling its machinery and equipment in Israel before Jack traveled there. That conclusion is bolstered by Jack's failure to pursue discussions with his one Israeli contact after finding that that person could not profitably use the machinery. It is also notable that Jack made his own personal arrangements to travel abroad with his wife before he wrote a letter contacting the potential customer in Israel. All of those facts taken together lead this Court to conclude that all of the claimed $2000 of expenses which Jack incurred in traveling to Israel and Greece in attempting to sell Perma-Rock's leased equipment and machinery for some $30,000 was not ordinary and necessary according to the ways of conduct in the business world and thus not deductible under Section 162(a) of the Code.

 This Court also concludes that the nondeductible $2000 payment to Jack from Perma-Rock was not for corporate purposes of Perma-Rock but was received by Jack for income tax purposes in his status as a stockholder and thus was properly deemed a dividend to him. *See* Walker v. Commissioner, 362 F.2d 140, 143 (7th Cir.), cert. denied, 385 U.S. 865, 87 S.Ct. 124, 17 L.Ed.2d 92 (1966); Westerhaus Co., CCH Tax Ct. Mem. 1957–213 (at pp. 976–78); *cf*. Motel Co. v. Commissioner, 340 F.2d 445, 448–449 (2d Cir. 1965); Tidwell v. Commissioner, 298 F.2d 864, 865–866 (4th Cir., 1962). The record in this case clearly shows that Jack's trip overseas with his wife was primarily personal in nature. Out of some five to six weeks spent in Europe and Israel with his wife, Jack engaged in business discussions during parts of about five days. He had already made plans to fly overseas before he wrote letters to contacts in Israel and Greece. The minimal preliminary investigation taken by Jack in arranging to see potential purchasers of the leased equipment and machinery is further evidence of the primarily personal nature of the Chertkofs' trip overseas. Thus, the $2000 payment was tantamount to a distribution to Jack on account of his status as a Perma-Rock stockholder and was properly treated as a dividend.

### C. *Partial Liquidation*

The parties stipulated that upon its incorporation in 1951 Perma-Rock became engaged in the business of processing, storing and selling light-weight aggregate and related building materials. Perma-Rock's manufacturing activities consisted principally of the heat expansion of crushed perlite, a volcanic material, to produce a product called "Permalite" under a license from Great Lakes Carbon, Inc. This aggregate was also marketed under a "Perma-Rock"

label.[39] During the taxable years involved in these cases to and including February 10, 1964, all of Perma-Rock's stock was held as follows: [40]

| Class A (Voting) | Number of Shares | Par Value (per share) | Total Value |
|---|---|---|---|
| Jack O. Chertkof | 50 | $1 | $50 |
| E. Robert Chertkof | 11 | 1 | 11 |
| Howard L. Chertkof | 9 | 1 | 9 |
| Total | 70 | | $70 |

| Class B (Non-Voting) | Number of Shares | Par Value (per share) | Total Value |
|---|---|---|---|
| Jack O. Chertkof | 140 | $500 | $70,000 |

Jack purchased all of his shares at par value.[41] On February 10, 1964, Perma-Rock redeemed all of Jack's 140 shares of Class B stock for $31,500 cash and a $42,000 mortgage note, payable within ten years with interest at 4%.[42] The Chertkofs treated $70,000 of the redemption proceeds as a return of capital and $3500 of the proceeds as a dividend from Perma-Rock in their 1964 joint federal income tax return.[43]

In its fiscal year ended September 30, 1965, Perma-Rock claimed a deduction for $1680 as interest expense on its $42,000 mortgage note paid on February 5, 1965 to Jack, and also made a principal payment on the note of $7000 on that same date.

The IRS determined that Perma-Rock's distribution to Jack in redemption of his Class B stock on February 10, 1964 constituted a dividend to Jack in the amount of $44,959.56, the amount of Perma-Rock's earnings and profits in its fiscal year ended September 30, 1964.[44] The IRS also determined that

the payments to Jack of $1680 and $7000 by Perma-Rock as interest and principal, respectively, on his $42,000 mortgage note on February 5, 1965 were dividends to Jack and nondeductible by Perma-Rock.

■ Perma-Rock and the Chertkofs take the position that Perma-Rock's redemption of Jack's Class B stock on February 10, 1964 was a partial liquidation under Section 346(a)(2) under a "corporate contraction" theory of the Code and thus the distribution to Jack was entitled to be treated as in exchange for his stock under Section 331(a)(2).[45]

Section 346(a)(2) of the Code provides that a distribution shall be treated as in partial liquidation of a corporation if "the distribution is not essentially equivalent to a dividend, is in redemption of a part of the stock of the corporation pursuant to a plan, and occurs within the taxable year in which the plan is adopted or within the succeeding taxable year. . . ." In this case, the redemption of Jack's Class B stock

39. Stip. # 1, ¶ 7.

40. Stip. # 1, ¶ 8.

41. Stip. # 1, ¶ 9.

42. Stip. # 1, ¶ 15, Ex. 10.

43. That treatment seems inconsistent with the Chertkofs' claim that the entire redemption was a partial liquidation under Section 346(a)(2) of the Code thus entitling the proceeds to be deemed as received in ex-

change for stock under Section 331(a)(2) of the Code.

44. *See* Sections 301 and 316(a) of the Code re dividend treatment of corporate distributions.

45. Section 331(a)(2) of the Code provides: *Partial liquidations.*—Amounts distributed in partial liquidation of a corporation (as defined in section 346) shall be treated as in part or full payment in exchange for the stock.

was pursuant to a plan adopted on December 15, 1963 at a Special Meeting of the Board of Directors of Perma-Rock [46] and the distribution to Jack on February 10, 1964 was within the time limitations set forth in Section 346(a)(2). The issues in dispute under Section 346(a)(2) are whether, and to what extent, the February 10, 1964 distribution was not essentially equivalent to a dividend and thus constituted a partial liquidation.[47]

A distribution by a corporation pursuant to a voluntary or involuntary bona fide contraction of its corporate business qualifies as a partial liquidation. Treas.Reg. 1.346–1(a)(2)(iii) gives the following example of a partial liquidation under Section 346(a):

> * * * a distribution resulting from a genuine contraction of the corporate business such as the distribution of unused insurance proceeds recovered as a result of a fire which destroyed part of the business causing a cessation of a part of its activities. On the other hand, the distribution of funds attributable to a reserve for an expansion program which has been abandoned does not qualify as a partial liquidation within the meaning of section 346(a). * * *

The legislative history and interpretation of Section 346(a)(2) are discussed, in part, as follows in Bittker & Eustice, Federal Income Taxation of Corporations & Shareholders (1971 Ed.), at 9–49:

> ¶ 9.52. *Corporate contractions:* § *346(a)(2)*
>
> A distribution is a partial liquidation under § 346(a)(2) if it (a) "is not essentially equivalent to a dividend," (b) is in redemption of a part of the stock of the corporation pursuant to a plan, and (c) occurs within the taxable year in which the plan is

adopted or within the succeeding taxable year. The first of these requirements invokes the "corporate contraction" doctrine and raises difficult questions of interpretation; the second and third are more formal in nature and ordinarily should be satisfied without difficulty.

1. *"Not essentially equivalent to a dividend."* This language echoes the phraseology of § 115(g) of the 1939 Code and carries forward, to some degree at least, the corporate "contraction" doctrine developed in the pre-1954 law decisions. Thus, the Senate Report on the 1954 Code states (p. 262) that "partial liquidation" in the 1954 revision primarily "involves the concept of 'corporate contraction' as developed under existing law." At another point, the Senate Report states:

> The general language of the proposed draft would include within the definition of a partial liquidation the type of cases involving the contraction of the corporate business. Such as for example, cases which hold that if the entire floor of a factory is destroyed by fire, the insurance proceeds received may be distributed pro rata to the shareholders without the imposition of a tax at the rates applicable to the distribution of a dividend, if the corporation no longer continues its operations to the same extent maintained by the destroyed facility. Voluntary bona fide contraction of the corporate business may of course also qualify to the same extent as under existing law. [S.Rep.No.1622, 83rd Cong., 2d Sess., p. 49 (1954).]

In Imler, 11 T.C. 836, 840, acquiesced in 1949–1 Cum.Bull., which was specifically approved in the Senate Report covering Section 346(a)(2) [48] as setting forth the proper interpretation of a par-

---

46. *See* Ex. 8.

47. In using the words "partial liquidation" hereinafter under Section 346, this Court is assuming that the "plan" and "timing" re-

quirements of that Section have been met as they have been in fact met in this case.

48. S.Rep.No.1622, 83rd Cong., 2d Sess., p. 262 (1954). *See* Bittker & Eustice, *supra* at 9–49 to 9–50.

tial liquidation, the Tax Court stated that the determination of whether a distribution qualified as a partial liquidation under the "corporate contraction" theory was primarily a question of fact, and that "the presence or absence of a real business purpose, the motives of the corporation at the time of the distribution, the size of the corporate surplus, the past dividend policy, and the presence of any special circumstances relating to the distribution" (id. at 840) have been considered in other cases as important facts in that determination.

The record in this case shows that Jack entered the business of making perlite in 1951 when he formed Perlite Products, Inc. and secured a license from Great Lakes Carbon, Inc. to make perlite.[49] In 1951, Jack changed the name of the company to Perma-Rock because of his desire to make a new product that he could stand behind under a tradename different from Permalite.[50] Perma-Rock initially did well, but it started to lose money around 1960, 1961 and 1962 because of increased competition.[51] Around 1958 or 1959, because he wanted to get out of the perlite business because of excessive competition costs and general aggravation, Jack offered to sell the Perma-Rock plant to Zonolite.[52] Negotiations took place over some three years during which time Perma-Rock sold perlite to Zonolite. In the latter half of 1963, Perma-Rock's negotiations with Zonolite culminated in the execution of a lease agreement on December 5, 1963 and the sale to Zonolite of Perma-Rock's spare parts, miscellaneous equipment on hand in December, 1963, and its inventory as of December 31, 1963 of raw materials, empty bags and finished goods.[53] The lease agree-

ment was for one year, commencing January 1, 1964 and ending December 31, 1964, and covered both Perma-Rock's equipment and plant, with an option to purchase the equipment at the end of one year.[54] Zonolite notified Perma-Rock of its exercise of the option to purchase on November 30, 1964 and a bill of sale was executed on December 28, 1964.[55] The spare parts, miscellaneous equipment and inventory were purchased for $32,103.98 which payment was made by Zonolite and received by Perma-Rock on January 28, 1964.[56] As of January 1, 1964, Zonolite took possession of Perma-Rock's plant premises, prime equipment, inventory and spare parts covered by either the lease or sale agreements between Perma-Rock and Zonolite entered into in December, 1963.[57] On January 2, 1964, Perma-Rock paid off in full the final balance of $10,000 on its indebtedness to E. Robert Chertkof, Jack's son and a stockholder in Perma-Rock, which $10,000 debt was secured by a mortgage on the land and improvements of Perma-Rock constituting the premises of its operation.[58] All of Jack's Class B stock was redeemed on February 10, 1964.[59]

Before its lease and sale of assets to Zonolite in December, 1963, Perma-Rock had five employees. After such transaction Perma-Rock had no paid employees.[60] Jack testified that Perma-Rock was out of the perlite business after it signed the lease agreement on December 5, 1963.[61] Presently, Perma-Rock owns one piece of property and rents it.[62]

■ This Court concludes that as of February 10, 1964, Perma-Rock had undergone a corporate contraction within the meaning of Section 346(a)(2) and

49. Tr. 9–11.

50. Tr. 14–15.

51. Tr. 16.

52. Tr. 17.

53. Stip. # 1, ¶¶ 10, 11.

54. Ex. 6.

55. Stip. # 1, ¶ 17.

56. Stip. # 1, ¶ 11.

57. Stip. # 1, ¶ 13.

58. Stip. # 1, ¶ 14.

59. Stip. # 1, ¶ 15.

60. Tr. 31.

61. Tr. 37–38.

62. Tr. 75.

thus at least part of its distribution on that date was entitled to partial liquidation treatment. As of February 10, 1964, Perma-Rock had sold all of its miscellaneous equipment and inventory and had leased, with an option to buy, its plant and its basic machinery and equipment, items essential to its perlite operations. Jack, in uncontradicted testimony, stated that he had negotiated for several years a sale to Zonolite and had unequivocally decided to get out of the perlite business at least by February 10, 1964, because he was losing money in the increasingly competitive market. There is no evidence indicating that Perma-Rock's sale and lease of nearly all of its physical assets to Zonolite was not a bona fide business decision to remove itself from the perlite business. Immediately after such sale and lease, Perma-Rock operated with no employees whereas earlier it had employed five persons. After its sale and lease of operating assets to Zonolite in early January, 1964, Perma-Rock permanently ceased any production. Perma-Rock had clearly contracted its business of producing perlite by February 10, 1964 and thus its distribution on that date, at least in part, was entitled to partial liquidation treatment.[63] In reaching that conclusion this Court specifically notes Perma-Rock's failure to declare any dividends [64] and hereafter in this opinion will refer to that failure. However, such a dividend policy, while one fact to be considered, is not necessarily controlling. *See, e. g., Imler, supra.* Nor will it be treated as controlling herein.

However, under Rev.Rul. 60–232, 1960–2 Cum.Bull. 115,[65] the amount of

Perma-Rock's distribution to Jack on February 10, 1964—$73,500—that is entitled to partial liquidation treatment includes only the net proceeds derived from the sale of its operating assets plus that portion of the working capital (including cash) reasonably attributable to the operation of its terminated business activity. As of February 10, 1964, Perma-Rock had sold its parts, miscellaneous equipment, and inventory to Zonolite for $32,103.98.[66] This Court holds that that amount qualified for partial liquidation treatment. Also as of February 10, 1964, Perma-Rock had under lease its prime machinery and equipment to Zonolite for one year with an unexercised option to purchase for $30,000. As of that date, Zonolite had made a $5000 rent deposit, but no other rental payments. That $5000 could be credited against the $30,000 purchase price if Zonolite exercised its purchase option. Zonolite did notify Perma-Rock of its intent to exercise the option by a letter dated November 30, 1964, after making three quarterly rental payments in April, July and October of 1964. However, Perma-Rock had not sold or otherwise disposed of its leased machinery and equipment on February 10, 1964. Against that factual background and for the reasons stated below, the value of those leased assets may not be deemed amounts eligible for partial liquidation treatment.

Rev.Rul. 60–232, 1960–2 Cum.Bull. 115 states:

Advice has been requested whether a distribution of certain property by a corporation to its shareholders in redemption of a portion of its stock

---

63. For other examples of corporate contractions, *see* Est. of Abraham Frisch, 18 CCH Tax Ct.Mem. 358 (1959) ; Rosania, 15 CCH Tax Ct.Mem. 580 (1956) ; Rev.Rul. 71–250, 1971–1 Cum.Bull. 112 ; Rev.Rul. 55–373, 1955–1 Cum.Bull. 363 ; *cf.* Farmers Union Corp. v. Commissioner, 300 F.2d 197 (9th Cir.), cert. denied, 371 U.S. 861, 83 S.Ct. 117, 9 L.Ed.2d 99 (1962). The fact that Jack was the dominant stockholder of Perma-Rock at the time of redemption does not require a conclusion that the questioned distribution in this case was a dividend because partial liquidations are determined by what

happens at the corporate level. *See* United States v. Davis, 397 U.S. 301, 311 n. 11, 90 S.Ct. 1041, 25 L.Ed.2d 323 (1970). For cases in which corporate contractions did not take place, *see* McCarthy v. Conley, 341 F.2d 948, 953–955 (2d Cir.), cert. denied, 382 U.S. 838, 86 S.Ct. 85, 15 L.Ed.2d 80 (1965) ; Dunton v. Clauson, 67 F.Supp. 839 (D.Me.1946) ; Chandler v. Commissioner, 22 T.C. 1158 (1954).

64. Tr. 69.

65. Set forth *infra* at pp. 173–175.

66. *See* n. 53 *supra.*

qualifies as a distribution in partial liquidation of the corporation within the meaning of section 346(a) of the Internal Revenue Code of 1954.

The instant corporation was engaged principally in the business of repairing contractors' equipment. The corporation also bought, sold and traded used contractors' equipment. It had an inventory of such equipment which it rented to contractors. The corporation owns the building in which the business was conducted.

The above-described business was actively conducted until the date of its recent sale in an arm's-length transaction, the buyer having no business connection with the corporation and its stockholders. The assets sold consisted of rental equipment, all miscellaneous inventory, all work in process and a service truck. The buyer leased the real estate of the corporation and also other property, consisting of shop equipment, machines, tools, office furniture and fixtures and storage equipment. The corporation thereafter was engaged only in the business of leasing such property to the buyer.

The termination of the foregoing business made advisable the partial liquidation of the corporation. Accordingly, pursuant to a plan of partial liquidation, the corporation distributed an amount in cash and securities equal to the net proceeds from the sale of the business assets plus that portion of the working capital (cash, accounts receivable, etc.) attributable to the business activity terminated by the sale. This distribution was pro rata to the stockholders and each stockholder turned in for cancellation and redemption a portion of his stock in the corporation.

The issue is whether the amount of the distribution which is treated as in partial liquidation within the purview of section 346(a) of the Code may exceed the net proceeds realized from the sale of the business assets.

The IRS concluded by stating:

It does not appear that prior case law, as developed under the 1939 Code, prohibited the distribution of working capital in addition to the proceeds of the sale of assets in situations where there was a genuine contraction of corporate activity.

The amount of working capital utilized in the operation of a terminated business would clearly be "attributable to" that business, as it was necessary to the conduct of the terminated business. Since section 346(b) of the Code merely defines one type of distribution which is included in the general rule set forth in section 346(a), the same result obtains under the general rule and, therefore, the amount distributable in partial liquidation may include that portion of the working capital which is reasonably attributable to the business activity terminated.

In view of the foregoing, the Service holds that, in general, the amount which may be properly distributed as a partial liquidation includes not only the net proceeds derived from the sale of operating assets, or the assets themselves, but also includes that portion of the working capital (including cash) reasonably attributable to the business activity terminated.

In determining the amount of working capital reasonably attributable to the operation of the business activity terminated, the Service will take into consideration all pertinent factors. The amount of working capital actually used in the business activity just prior to its termination will be the primary consideration. However, an unusual or abnormal increase just prior to the distribution in the size of inventories, work in process, accounts receivable, cash accounts, or other items, may indicate an attempt to secure partial liquidation treatment of a distribution involving an amount of working capital in excess of that normally required in the operation of the business terminated. The amount of cash and other liquid assets is never

in itself an indication of the amount of working capital attributable to a business activity since a corporation may retain liquid assets in excess of the needs of its business. Because the determination of the amount of working capital attributable to any business activity is a factual matter, a specific determination on this point will be made by the Service only after an examination of the income tax return of the corporation making the distribution in partial liquidation.

Under that Ruling, the proceeds of assistant case, it is held that the distribution by the corporation, limited in amount to the net proceeds from the sales of assets related to the contractor's equipment business plus that portion of the working capital reasonably attributable to the terminated business activity and no longer required in the operation of the continuing business activities, constitutes a partial liquidation within the meaning of section 346(a) of the Code.

Under that Ruling, the proceeds of assets actually sold in partial liquidation, but apparently not the value of assets merely leased, are entitled to be treated as partial liquidation distributions. The described corporate contraction in this Ruling consisted both of sales and leases of assets formerly used in the contractors' equipment business. The IRS stated that both the net proceeds derived from the sale of operating assets plus that portion of the working capital reasonably attributable to the business activity terminated were eligible for partial liquidation treatment but significantly did not state that the value of the leased assets were entitled to that treatment. The issue before the IRS was

what amounts in excess of the net proceeds realized from the sale of the business assets were, under Section 346(a) of the Code, eligible for distribution in partial liquidation. Under the circumstances, the failure of the IRS to include the value of leased assets as an amount eligible for partial liquidation treatment is noteworthy. Accordingly, the value of the leased machinery and equipment will not be treated herein as available for partial liquidation distribution on February 10, 1964. And because Perma-Rock did not sell its machinery and equipment to Zonolite until some eight months after its distribution to Jack in partial liquidation on February 10, 1964, the proceeds of that sale were not eligible on that date for partial liquidation treatment.[67] Thus, the only amounts Perma-Rock had eligible for partial liquidation distribution on February 10, 1964 was $32,103.98, the proceeds of the sale of its inventory, spare parts and miscellaneous equipment, plus the amount of its working capital reasonably attributable to the termination of its business of expanding perlite.[68]

■ The parties have stipulated that Perma-Rock's working capital should be deemed to be the amount by which its current assets exceeded its current liabilities[69] and have stipulated as to what Perma-Rock's current assets and current liabilities were as of the dates September 30, 1963, December 5, 1963, December 31, 1963, February 9, 1964, and February 10, 1964. Under Rev.Rul. 60–232, in the determination of working capital reasonably attributed to the operation of a terminated business activity, the working capital actually used in the business activity just prior to its termination must be given primary considera-

---

67. The $5000 rental deposit received by Perma-Rock prior to February 10, 1964 was eligible for partial liquidation treatment to the extent that it constituted working capital reasonably attributed to Perma-Rock's contracted business as discussed hereinafter.

68. Jack indicated (Tr. 88–89) that the working capital needed for the operation of Perma-Rock's leasing business was the amount

of cash Perma-Rock had on hand on February 10, 1964. That amount was $6649.65. (Stip. # 2, Balance Sheet). Thus, under Rev.Rul. 60–232, the maximum amount of Perma-Rock's working capital available for partial liquidation treatment would be its reasonable working capital before contraction less $6649.65.

69. Stip. # 2, ¶ 3.

tion. Thus, in this case, the working capital Perma-Rock had eligible for partial liquidation treatment is determinable by taking the working capital reasonably needed to operate its business before contraction and subtracting from that amount Perma-Rock's working capital as of February 10, 1964, the date of the challenged distribution.

The parties have stipulated [70] that Perma-Rock's working capital as of February 10, 1964, excluding any of the $32,103.98 received by Perma-Rock in January, 1964 [71] for the sale of its spare parts and equipment, raw materials, finished goods and empty bags to avoid any "doubling up" of amounts eligible for partial liquidation treatment, was $10,601.20.[72] The parties have also stipulated that Perma-Rock's working capital on December 5, 1963 was $31,382.25,[73] excluding the value of the assets described above that were sold by Perma-Rock in January, 1964 for $32,103.98. Nothing in the record indicates that that amount of working capital was unreasonable for Perma-Rock's operations as of December 5, 1963 [74] and this Court finds that that amount was reasonable. This Court concludes that December 5, 1963 is the proper date to determine the working capital reasonably attributable to Perma-Rock's discontinued perlite operations because on that date Perma-Rock executed a lease agreement with Zonolite concerning its prime equipment, machinery and factory, thereby giving substantial objective evidence that it intended to liquidate its perlite business.

Thus, Perma-Rock had $20,781.05 ($31,382.25 less $10,601.20) of contracted working capital eligible for partial liquidation treatment on February 10, 1964. The total amount of Perma-Rock's February 10, 1964 partial liquidation distribution eligible for partial liquidation treatment was thus $20,781.05 plus the $32,103.98 received as the sale of assets, which equals $52,885.03. Since Jack received a partial liquidation distribution of $73,500 in the form of $31,500 cash and a $42,000 note, $52,885.03 of that distribution qualifies for partial liquidation treatment.

Nothing in the record indicates that the $42,000 note [75] was not a bona fide debt instrument. Thus, Perma-Rock was entitled to a $1680 interest expense [76] deduction for that note in its fiscal year ended September 30, 1965. It also follows that the $7000 principal payment on that note on February 5, 1965 was not a dividend to the Chertkofs but a return of capital.

For the reasons set forth above, this Court affirms the determinations of the IRS in all respects with the following exceptions: (1) Perma-Rock was entitled to a $1680.00 interest expense deduction in its fiscal year ending September 30, 1965; (2) $52,885.03 of the February 10, 1964 distribution of $73,500.00 to Jack was entitled to partial liquidation treatment under Section 346(a)(2) of the Code; and (3) Perma-Rock's $7000 payment to Jack on a $42,000 note was a return of capital and not a dividend to the Chertkofs in 1965.

---

70. Letter stipulation dated May 24, 1973 in response to a letter from this Court dated May 4, 1973.

71. Ex. 7.

72. Perma-Rock had no current liabilities as of February 10, 1964. Stip. # 2.

73. $34,170.28 of current assets (see letter dated May 24, 1972) less $2788.03 of current liabilities (see Stip. # 2).

74. See Tr. 172–75 with regard to testimony concerning Perma-Rock's needs for working capital.

75. The note secured by a mortgage obligated Perma-Rock to pay Jack $42,000 within ten years, with a right of prepayment, with interest at four percent. See Ex. 10.

76. Even if the $42,000 note was deemed a dividend, Perma-Rock would still be entitled to an interest expense deduction for interest paid thereon. J. Mertens, Law of Federal Income Taxation § 26.07 (1972 ed.).