BIOCRAFT LABORATORIES, INCORPORATED, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Biocraft Laboratories, Inc. v. Commissioner
Docket No. 9968-76.
United States Tax Court
T.C. Memo 1980-268; 1980 Tax Ct. Memo LEXIS 316; 40 T.C.M. (CCH) 734; T.C.M. (RIA) 80268; July 23, 1980, Filed Lanny M. Sagal and Stephen S. Ziegler, for the petitioner. Daniel K. O'Brien, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION
*317 DAWSON, Judge: Respondent determined the following deficiencies in petitioner's Federal income taxes: Taxable Year
Ended March 31
Deficiency
1970
$125,515.00
1971
73,458.62
1972
10,373.57
The issues presented for our decision are: (1) Whether a payment made to petitioner constituted compensation for lost profits, consideration for an option, or both, and (2) determination of the proper year of inclusion and correct characterization of the payment. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Biocraft Laboratories, Inc. (petitioner) is a corporation organized under the laws of the State of New Jersey. Petitioner's principal offices were located in East Paterson, New Jersey, when it filed its petition in this case. Its Federal corporate income tax returns (Form 1120) for the fiscal years ending March 31, 1970 to March 31, 1972, inclusive, were filed with the Internal Revenue Service Center at Philadelphia, Pennsylvania. Petitioner's return for the year ending March 31, 1973, was filed with the Brookhaven *318 Internal Revenue Service Center, Holtsville, New York. On or about April 23, 1973, petitioner filed with the Brookhaven Service Center a Form 1139, Corporation Application for Tentative Refund from Carryback of Net Operating Loss, Net Capital Loss, and Unused Investment Credit. Petitioner has been engaged in the manufacture and sale of pharmaceuticals since 1964. In 1970, petitioner decided to expand its product line to include Ampicillin Trihydrate, a semisynthetic penicillin (hereinafter referred to as Ampicillin). In mid-1971, petitioner began to purchase bulk Ampicillin from a manufacturer in Italy and to process the Ampicillin into powders and capsules at petitioner's factory in Elmwood, New Jersey. In late 1971, petitioner commenced construction of a factory for the manufacture of bulk Ampicillin and initiated proceedings before the Food and Drug Administration (FDA) to obtain that agency's approval for the manufacture of bulk Ampicillin. The factory was completed in mid-1972. A.H. Robins Company, Inc. of Richmond, Virginia, (hereinafter referred to as Robins) is a publicly held corporation engaged in the manufacture and distribution of pharmaceuticals and related products. *319 Prior to 1972, Robins was one of petitioner's best customers, purchasing penicillin and other drugs, but not Ampicillin, from petitioner. Robins desired to enter the Ampicillin market and in late 1971 began negotiations with the Bristol-Beecham Company, which at that time held the patent on Ampicillin, to obtain Ampicillin from that firm. Robins was unsuccessful in obtaining the Ampicillin from Bristol-Beecham Company because of its insistence that Robins provide Bristol-Beecham with one of its products. None of the products offered by Robins in exchange were acceptable to Bristol-Beecham Company. Robins, however, had some doubts as to the validity of the Ampicillin patent held by Bristol-Beecham Company, and believed that it could legally obtain the Ampicillin from another manufacturer. By contract dated May 1, 1972, Robins and petitioner entered into an agreement (hereinafter called the Ampicillin Agreement) wherein petitioner agreed to produce and supply all of Robins' reasonable requirements of Ampicillin and Robins agreed to purchase from petitioner exclusively its entire requirements of Ampicillin during the term of the Agreement. The Ampicillin Agreement provided, *320 in part, as follows: AMPICILLIN AGREEMENT
THIS AGREEMENT made as of the 1st day of May, 1972, by and between A.H. ROBINS COMPANY, INCORPORATED, * * * and BIOCRAFT LABORATORIES, INCORPORATED, * * *
1. On and subject to the terms hereof, BIOCRAFT hereby agrees to produce and supply all of ROBINS reasonable requirements of the Products necessary for it to supply its customers in accordance with its established business practices. ROBINS agrees to purchase from BIOCRAFT exclusively its entire requirements for the Products during the term of this Agreement. ROBINS shall issue purchase orders from time to time specifying the quantity of the Products desired. * * *
9. * * * In the event ROBINS decides to discontinue marketing any of the Products, it agrees to purchase from BIOCRAFT, at the latter's cost, capsules and packaging materials for such Product which BIOCRAFT inventories for the purposes herein. * * *
15. If the manufacture, transportation, delivery, receipt or use by either party of any of the material and supplies needed by the parties or the suppliers covered hereby is prevented, restricted or interfered with by reason of: * * *
(c) any *321 law, order, proclamation, regulation, ordinance, demand or requirement of any government or of any subdivision, authority or representative of any such government, or (d) any other cause whatsoever, whether similar or dissimilar to those above enumerated, beyond the reasonable control of the party, the party so affected upon prompt notice to the other party (and, in case ROBINS gives such notice, in advance of actual shipment) shall be excused from making or taking deliveries hereunder to the extent of such prevention, restriction or interference. * * *
(f) Failure of BIOCRAFT to supply ROBINS orders within the time period for any of the foregoing shall excuse ROBINS from its obligation to purchase the Products exclusively from BIOCRAFT, during that period of time. * * *
17. Any notice expressly provided for under this Agreement shall be in writing, shall be given either manually or by mail, telegram, radiogram or cable, and shall be deemed sufficiently given if and when received by the party to be notified at its address first set forth above, or if and when mailed by registered or certified mail, postage prepaid, addressed to such party at such address. Either *322 party may, by notice to the other change its address for receiving such notices. * * *
19. This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and may not be changed or modified orally, but only by an instrument in writing, signed by the parties, which states that it is an amendment to this Agreement. In accord with the Agreement, Robins submitted to petitioner two purchase orders on July 10, 1972, calling for delivery of specific quantities of Ampicillin during August 1972. Petitioner was unable to make delivery during August of 1972 due to delays encountered by petitioner in obtaining the requisite FDA approval of its process for manufacturing Ampicillin. Robins was aware of petitioner's problem, and it verbally granted petitioner extensions beyond the due date for delivery of the purchase orders. In the summer of 1972 the validity of the Bristol-Beecham Company patent on Ampicillin was litigated in England and upheld. The English litigation, along with Robins' concern that other manufacturers might be coming into the market and that the commercial price of Ampicillin had begun to deteriorate, conviced *323 Robins that it was in its best interest not to enter the Ampicillin market at that time. On November 1, 1972, Dale C. Taylor (Taylor), Director of Marketing for Robins, advised Harold Snyder (Snyder), president of petitioner, by telephone that Robins had decided against entering the Ampicillin market. In that conversation it was agreed that further talks would be arranged to attempt to reach a settlement with respect to Robins' decision not to enter the Ampicillin market. On November 6, 1972, Snyder advised Robins by letter that, in light of Robins' decision not to enter the Ampicillin market, he was most perplexed as to how to handle the outstanding purchase orders made by Robins. The letter explained that in the preceding week petitioner's plant process for manufacturing Ampicillin had been approved by the FDA, and petitioner was in full gear for production of Robins' orders, and had not yet received written notification from Robins regarding the outstanding purchase orders, as was required by section 17 of the Ampicillin Agreement. Petitioner, however, did stop production based on the November 1 telephone conversation. In closing, Snyder wrote that he would gather figures *324 in relation to the outstanding purchase orders to present at their November meeting. Snyder and Taylor met on November 9, 1972, to discuss the situation. At that meeting Snyder submitted a "settlement figure" of $800,000 which, if agreed to and paid in total, would release Robins from its commitment with petitioner resulting from its cancellation of the purchase orders. On or about December 1, 1972, representatives of petitioner and Robins met in Crystal City, Virginia. Robins indicated that its presence at the meeting was dictated by the consideration that, having made the decision not to go forward with the sale of Ampicillin, it was interested in working out an amicable cancellation of its agreement with petitioner for the furnishing of Ampicillin. After Robins indicated that it stood firm in its decision not to enter the Ampicillin market, its representatives maintained that Robins was responsible for petitioner's lost profits as a result of the decision. Petitioner then submitted to Robins a document entitled "Loss of Profit - A.H. Robins" whih reflected the loss of profit which petitioner would suffer with respect to Robins' purchase orders if the Ampicillin Agreement *325 were cancelled. This document reflected a total lost profit of $671,421. Taylor then made handwritten set-offs against the total lost profit figure during the course of the meeting of $274,000, $260,000 of which represented labor and depreciation costs that petitioner would save by not producing the Robins order. No agreement was reached at this first meeting. A second meeting was held in Richmond, Virginia, at which petitioner contended that Robins was responsible for lost profits of roughly $400,000 on the purchase orders. In addition, petitioner wanted Robins to agree to buy Ampicillin from it if Robins ever decided to reenter the Ampicillin market. An impasse developed at that point because Robins took the position that it should not be obliged to so bind itself. The impasse was broken when petitioner suggested, and Robins subsequently agreed, that if Robins decided to reenter the Ampicillin market it would buy Ampicillin from petitioner, and petitioner would give Robins a credit against any future purchases of Ampicillin for the approximately $400,000 that Robins would pay by way of the agreement. On December 8, 1972, an Agreement was entered into between petitioner *326 and Robins (the "Supplemental Agreement"). The Supplemental Agreement provided, in part, as follows: AGREEMENT
A.H. Robins Company, Incorporated, a Virginia corporation (Robins), and Biocraft Laboratories, Incorporated, a New Jersey corporation (Biocraft), entered into an agreement dated May 1, 1972 (May Agreement) for the manufacture and sale by Biocraft to Robins of such quantities of ampicillin trihydrate capsules and liquids (Ampicillin) as should be reasonably required by Robins for a period of four years. Robins has by two purchase orders dated July 10, 1972 and by two purchase orders dated August 23, 1972 (both sets of the orders constituting the Purchase Orders) ordered certain quantities of Ampicillin (to be sold by Robins under the name Amprobin). Biocraft has been unable to supply the products ordered by the dates specified in the Purchase Orders. Robins has decided not to market Ampicillin at this time and has no requirements for Ampicillin under the May Agreement or under the Purchase Orders. Robins and Biocraft desire to settle and release any obligations either party may have under the May Agreement and the Purchase Orders and under any other contracts *327 or obligations, express or implied, that the parties may have with each other in connection with the manufacture and sale of Ampicillin, on the terms and conditions herein set forth. Accordingly, in consideration of the foregoing and of the mutual covenants herein, the parties agree and covenant as follows: 1. Except as set forth herein, each party hereto, Robins and Biocraft, hereby releases the other party hereto from all claims, accounts, actions, suits, proceedings, and emands whatsoever which either Robins or Biocraft has or may have against the other for, or by reason or in respect of, any act, cause, matter or thing whatsoever relating to the manufacture, sale, purchase and distribution of Ampicillin. 2. In particular, Biocraft, its successors and assigns, does hereby expressly release and forever discharge Robins, its successors and assigns, from any claims, debts, responsibilities, or liabilities in law or in equity, which exist, heretofore, which may have existed, or which may hereafter exist for any reason, as a result, or arising our, of the execution of the May Agreement and the Purchase Orders and any conduct or representations by Robins in regard thereto. *328 3. Robins, its successors and assigns, does hereby expressly release and forever discharge Biocraft, its successors and assigns, from any claims, debts, responsibilities, or liabilities in law or in equity, which exist, which may heretofore have existed, or which may hereafter exist for any reason as a result, or arising out, of the execution of the aforesaid May Agreement and the Purchase Orders and any conduct or representation by Biocraft in regard thereto. 4. Robins shall make certain payments in further consideration of the releases contained herein, to-wit: a. The sum of TWO HUNDRED SEVENTY-THREE THOUSAND NINE HUNDRED FIFTY-SEVEN DOLLARS ($273,957) shall be paid to Biocraft on the date of execution of this release. Of this amount, $48,957 represents the cost incurred by Biocraft for, or in connection with, packaging materials for Ampicillin. b. An additional sum of TWO HUNDRED THOUSAND DOLLARS ($200,000) shall be paid to Biocraft on or before January 15, 1973. c. The sum of FIFTY SIX THOUSAND ONE HUNDRED FIFTY DOLLARS ($56,150) shall be paid by Robins to Eli Lilly and Company within ten (10) days of execution of this release, which sum is in payment of a certain *329 obligation of Biocraft to Lilly for capsules, which obligation was incurred in performance of the May Agreement, and Robins shall hold Biocraft harmless in respect of the payment of this obligation. 5. At the present time, Robins is undecided whether it intends in the future to enter the relevant market, and sell Ampicillin. Should Robins, however, elect to market Ampicillin prior to December 31, 1975, Robins and Biocraft agree as follows: a. Robins shall notify Biocraft in writing that it intends to sell Ampicillin. b. Upon such notification by Robins, the May Agreement shall again be in full force and effect with all the terms, conditions and obligations set forth therein, c. In the event that Robins shall give the aforesaid notice to Biocraft and the May Agreement shall again be in full force and effect, Robins shall be entitled to and shall receive from Biocraft a credit in the total amount of FOUR HUNDRED TWENTY FIVE THOUSAND DOLLARS ($425,000), which credit shall be applied to diminish the amount owed by Robins on any purchase orders it may, from time to time issue to Biocraft under the May Agreement. The credit shall be applied against purchase orders at the rate *330 of 10% of the gross amount of each purchase order until the total credit has been exhausted. d. Revival of the May Agreement pursuant hereto shall not have the effect of renewing any Purchase Orders. 6.In the event that Robins does not market Ampicillin until after December 31, 1975, it shall be under no obligation at any time to purchase Ampicillin from Biocraft and may freely contract for the manufacture of Ampicillin by and may purchase Ampicillin from any source including direct competitors of Biocraft without any obligation to Biocraft. Petitioner did not include in gross income for the fiscal year ending March 31, 1973, the $425,000 received from Robins during that fiscal year. On its financial statement for the fiscal year the $425,000 (not allocable to reimbursements under section 5 of the Supplemental Agreement) was treated as deferred income. Robins deducted the payment on its Federal corporate income tax return for the year in which the payment was made. As of December 31, 1975, Robins had not notified petitioner, pursuant to the Supplemental Agreement, that it desired to reenter the Ampicillin market. ULTIMATE FINDING OF FACT The $425,000 payment from *331 Robins to petitioner, pursuant to the terms of the Supplemental Agreement, constituted primarily consideration for loss of anticipated profits. The predominant purpose of Robins' payment was to compensate petitioner for anticipated profits which were lost as a result of its desire to extricate itself from an economically undesirable contract. OPINION Payments received under an option to purchase which are to be applied to the purchase price if the option is exercised, but which are to be retained if the option is not exercised, are not income to the grantor until the option lapses or is exercised. Virginia Iron Coal & Coke Co. v. Commissioner, 37 B.T.A. 195 (1938), affd. 99 F.2d 919 (4th Cir. 1938); Section 1.1234-1(b), Income Tax Regs. Payments received for loss of anticipated profits are taxable in the year of receipt. Martin Brothers Box Co. v. Commissioner, 142 F.2d 457 (6th Cir. 1944), affg. a Memorandum Opinion of this Court. The issue to be decided here is the proper characterization of the payment made by Robins to petitioner. Petitioner contends that Robins was not legally liable for petitioner's lost profits under *332 the Ampicillin Agreement, and therefore the payment it made should not be characterized as consideration for lost profits. [1] Because of Robins' strong legal defenses under the Ampicillin Agreement, and the fact that Robins was one of petitioner's best customers of its other products, it is argued that Robins knew that petitioner would not sue to recover any lost profits. Therefore, petitioner asserts that Robins would not make the $425,000 payment to it in consideration for a release of legal liability for such lost profits. Instead, petitioner contends that the $425,000 payment was intended to serve as (1) consideration for an option granted to Robins to extend its rights under the Ampicillin Agreement to purchase Ampicillin at specified prices from petitioner, and (2) a payment on account of the purchase price of Ampicillin if Robins should decide to exercise the option and purchase Ampicillin from petitioner. *333 To the contrary, respondent contends that Robins was legally liable under the Ampicillin Agreement, and, alternatively, that the fact of legal liability is not controlling with respect to the issue of characterization of the payment. Respondent argues that Robins' reason for making the payment, which was to compensate petitioner for anticipated profits lost because of Robins' cancellation of its purchase orders, controls the characterization of such payment for tax purposes. Although it is uncertain whether or not Robins was legally liable, we agree with respondent's statement of the law and with his characterization of Robins' payment. To determine the proper characterization of the payment, what is controlling is the basic reason for or function of the payments involved. Agar v. Commissioner, 290 F.2d 283 (2d Cir. 1961), affg. a Memorandum Opinion of this Court. As respondent correctly asserts, this Court need not consider as controlling whether petitioner had a viable cause of action against Robins with respect to the purchase orders or whether Robins had a bona fide obligation to pay petitioner the $425,000. Payments may be income to a recipient-taxpayer *334 although the payor was under no legal obligation to make payment. Webber v. Commissioner, 21 T.C. 742 (1954); Commissioner v. Duberstein, 363 U.S. 278 (1960). Robins' reason for making the payment controls. The record shows that the basic reason for the payment was to compensate petitioner for lost profits. From the first telephone conversation between Snyder and Taylor until the final meeting in Richmond between petitioner and Robins, petitioner consistently charged Robins with liability for lost profits and presented settlement figures based on a computation of lost profits. Petitioner's submission of the document entitled "Loss of Profit - A.H. Robins" at the December 1, 1972, Crystal City meeting, and Taylor's written adjustments to the settlement figure thereon strongly indicate the intent of the parties to reach a settlement as to Robins' liability for lost profits.
The language used in the Supplemental Agreement supports respondent's view that the principal reason for the payment was to compensate petitioner for lost profits. It states: Robins and Biocraft desire to settle and release any obligations either party may have under *335 the May Agreement and the Purchase Orders and under any other contracts or obligations, express or implied, that the parties may have with each other in connection with the manufacture and sale of Ampicillin, on the terms and conditions herein set forth. We think the basic intent of the parties in arriving at the Supplemental Agreement was not to create an option, but instead to release the parties from any liability they may have incurred under the Ampicillin Agreement. The Supplemental Agreement expressly releases Robins from contractual liability for lost profits by specifically providing that: In particular, Biocraft, its successors and assigns, does hereby expressly release and forever discharge Robins, its successors and assigns, from any claims, debts, responsibilities or liabilities in law or in equity, which exist, heretofore, which may have existed, or which may hereafter exist for any reason as a result, or arising out, of the execution of the May Agreement and the Purchase Orders and any conduct or representations by Robins in regard thereof. The Supplemental Agreement also speaks directly to the purpose of the payment when it states: "Robins shall make certain *336 payments in further consideration of the releases contained herein." Clearly, the parties intended that the $425,000 payment was to serve as consideration for release of contractual liability for lost profits, regardless of whether or not Robins was actually legally liable under the Ampicillin Agreement. As the Court of Appeals for the Second Circuit held in Agar v. Commissioner, supra, the controlling factor in determining whether payments are taxable is the basic reason for or function of the payments involved. In our judgment the facts here establish that the basic reason for the $425,000 payment to petitioner was to compensate it for the lost profits on the cancelled purchase orders. Therefore, the compensation for lost profits purpose should dictate the tax results of the transaction. Moreover, the patent problems inherent in buying Ampicillin from petitioner, which existed when Robins first advised petitioner it had decided against entering the Ampicillin market, were still present when the Supplemental Agreement was executed. Such problems seem to belie petitioner's contention that the payment was consideration for an option. It would not have made *337 good business sense for Robins to have paid anything to obtain, through an option, rights that it already possessed under the original Ampicillin Agreement.
Deduction of the payment by Robins on its Federal income tax return in the year it was made is also indicative of its intent to compensate petitioner for lost profits. If Robins believed that it was making the payment as consideration for an option, it would have capitalized the expenditure. In addition, the closeness of the amount paid to petitioner ($425,000) to the amount discussed (approximately $400,000) during the settlement negotiations tends to support the conclusion that the payment was compensation for lost profits. Alternatively, petitioner argues that, if the payment is found to be compensation for lost profits, the Court should also find it to be consideration for an option. Then, it contends that those cases [2] which deal with the "dual purpose" doctrine are applicable to control the tax treatment of the transaction. This contention must fail because the "dual purpose" doctrine is inapplicable where one purpose (compensation for lost profits) far outweighs the other (consideration for an option), as it does *338 here. Since payments for loss of anticipated profits are taxable as income when received, Martin Brothers Box Co. v. Commissioner, 142 F.2d 457 (6th Cir. 1944), affg. a Memorandum Opinion of this Court, and the basic purpose of Robins' payment was to serve as compensation for anticipated lost profits, we hold that the $425,000 payment made by Robins to petitioner is taxable as ordinary income to petitioner in the year of receipt. To reflect concessions made by the parties and our conclusions with respect to the disputed issues, Decision will be entered under Rule 155. Footnotes
1. Petitioner points out that section 9 of the Ampicillin Agreement limits Robins' liability, in the event Robins decided not to enter the market, to the petitioner's cost of capsules and packaging materials that petitioner inventoried for production of Ampicillin. With respect to Robins' cancellation of its purchase orders for Ampicillin, petitioner looks to sections 15(d) and 15(f) of the Ampicillin Agreement, which (1) excuse Robins from taking delivery of purchase orders where the delivery thereof is delayed, and (2) excuse Robins, when Biocraft fails to deliver in a timely manner, from its obligation to purchase Ampicillin exclusively from petitioner during that period of time.↩
2. See and compare Dill Co. v. Commissioner, 33 T.C. 196 (1959), affd. 294 F.2d 291 (3d Cir. 1961), with Kitchin v. Commissioner, 353 F.2d 13 (4th Cir. 1965), withdrawing 340 F.2d 895↩.